**FLAME COAL COMPANY et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.**

**No. 14498.**

United States Court of Appeals
Sixth Circuit.

May 21, 1962.

M. E. Boiarsky, Charleston, W. Va., and Harrison Combs, Washington, D. C. (Lay & Knuckles, Grant F. Knuckles, Pineville, Ky., on the brief), for defendant-appellant.

James S. Greene, Jr., Harlan, Ky., and Logan E. Patterson, Pineville, Ky., for plaintiffs-appellees.

Before MILLER, Chief Judge, and CECIL and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This is an appeal from plaintiffs' judgment in an action against United Mine

Workers of America for damages under Section 303 of the Labor Management Relations Act of 1947 (29 U.S.C.A. § 187) for secondary boycott and for the common law tort of wrongful interference with business. Upon a jury's verdict, judgment was entered for plaintiffs in the amount of $104,845.00, of which $54,845.00 was for compensatory and $50,000.00 for punitive damages.

Plaintiffs, Flame Coal Company, Co-Dee Coal Company and Amanda Coal Company, are Kentucky Corporations, referred to herein as Flame, Co-Dee and Amanda. At the time of the alleged wrongs, Co-Dee and Amanda were engaged in the auger mining of coal in Eastern Kentucky. The coal mined by them was sold to Flame, and transported by independent truckers to the premises of Flame where it was processed and loaded into railroad cars for shipment to Flame's customers. Flame, Co-Dee and Amanda are controlled by one person, Mrs. Virginia C. Collins, who is the principal stockholder of each, but each had one or more stockholders not common to the others.

Plaintiffs were among one hundred and seventy-six (176) coal companies in the southeastern Kentucky-northeastern Tennessee region which had not signed the National Bituminous Coal Wage Agreement of 1950, as amended in 1958. In the spring of 1959, starting about March 17, the defendant, United Mine Workers of America, carried on a campaign to obtain agreements with unsigned companies, including plaintiff Flame. The campaign was conceived and prosecuted on a grand scale. Spectacular and varied methods were employed. Mass picketing at the tipple sites, on the highways, on railroad sidings, and at the mines was carried on. Pickets, sometimes numbering in excess of a thousand men, roamed throughout the area in motor convoys. The persuasion of sheer numbers was supplemented by more violent and forceful methods. Trucks were stopped at tipples, and on the way to and from them; their loads were dumped on, and off of, the highway. Mine and tipple workers were beaten. Strong threats of violence were made to the independent truck drivers to persuade them to discontinue transporting coal from the mines to the tipples. After April 30, 1959, when mass picketing was substantially discontinued because of a federal court injunction (there was evidence by defendant that the picketing convoys were stopped because troublesome strangers were joining them) the pattern of coercion took a different and still more violent turn. Railroad tracks and bridges were dynamited, as were tipples, trucks and other equipment. In fulfillment of a prophetic warning to truckers and others that "when the leaves come out on the trees" more convincing methods would be employed, the Flame tipple was put under gunfire from the nearby hills almost daily. There was evidence that guards at the tipple, on some occasions, returned the fire.

The web of persuasion extended over a wide area. Mass picketing at the Flame tipple prevented the processing of coal there. Mass picketing at a railroad switching point prevented the removal of coal from the tipple. Trucks and automobiles were struck by bullets and that, with other threats, violence and interference, persuaded truckers to give up hauling coal from the Co-Dee and Amanda mines to the Flame tipple. On eight different occasions, the raiload spur track leading to the tipple was dynamited.

Field representatives of defendant United Mine Workers directed and led the convoys of pickets and were present at or near the scene of much of the described violence. These field men were selected and appointed by the President of District 30 of the defendant United Mine Workers. The events here involved occurred within District 30. Specific identification of the riflemen in the hills, the dynamiters, and other individuals, perpetrators of violence and threats, was not made. Defendant's witnesses testified of instructions given to the members of the convoys to behave themselves and not violate the law. Our review of the record, however, satisfies us that there was admissible and competent evidence

from which the jury could infer and find that defendant union was the author of, and responsible for, the violence and illegal conduct which effectively interrupted and interfered with the business of plaintiffs. The evidence was sufficient to support a verdict and judgment requiring defendant union to respond in damages for the acts of its members, agents and representatives. United Mine Workers of America v. Patton, 211 F.2d 742, 47 A.L.R.2d 850 (C.A. 4, 1954); United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52, 61 (C.A. 6, 1959) cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038.

Defendant's motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial were denied. On this appeal, it presents some fourteen statements of questions involved. We discuss such of them as we consider require it, as follows:

■ (1) *Jurisdiction*. Defendant denies the jurisdiction of the district court to entertain a case where a claim under Section 303 of the Labor Management Relations Act of 1947 (29 U.S.C.A. § 187) is joined with a non-federal common law action for tort.

This contention has been considered and disposed of, contrary to defendant's contention, in the cases of United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (C.A. 6, 1959), cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L. Ed.2d 1038; United Mine Workers of America v. Osborne Mining Company, 279 F.2d 716 (C.A. 6, 1960) cert. denied 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103; Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.A. 6, 1961), cert. denied 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76. In Meadow Creek, Judge Martin of this court quoted the district court's conclusion that, "the claim of secondary boycott and unlawful conspiracy are not separate causes of action, but are merely different grounds to support a single cause of action, the cause of action being the violation by the defendant of the plaintiff's right to be free from wrongful interference with its business."

Citing Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, he sustained the district court's retention of jurisdiction to dispose of the entire cause of action.

■ A different phase of defendant's attack upon the district court's jurisdiction is its argument that defendant, a voluntary unincorporated association, is not considered, in Kentucky, a jural entity subject to suit, and there being no diversity of citizenship between plaintiff and the officers and members of the union, jurisdiction in the federal court could not attach as to the common law action. However, federal jurisdiction attached here because of the secondary boycott and under Rule 17(b) F.R.Civ.P. 28 U.S. C.A. defendant, an unincorporated association, is suable as such and in the federal court may be made to respond in damages for its tortious conduct (29 U.S. C.A. § 187). Gilchrist v. United Mine Workers of America, supra (290 F.2d 39); United Mine Workers of America v. Osborne, supra (279 F.2d 716).

■ (2) *Was there proof of a secondary boycott?* Appellant argues that there was no evidence that the United Mine Workers encouraged employees of other employers to cease handling coal of the plaintiffs for a prohibited objective within the meaning of Section 303. Argument is made that defendant did not induce a concert of action by employees of any neutral employer; that the case did not present a situation involving *primary* and *secondary* employers. It is sufficient to say that the general objective of defendant was to require Flame to sign the union's contract. Co-Dee and Amanda were separate entities from Flame, as were the individual truckers and trucking companies. This union cannot escape the charge of secondary boycott because it chose to attack on all fronts at once, claiming its desire and objective to be the organization of all involved, whether producers, transporters or processors of coal. United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716, 723.

■ (3) *Admission of evidence of events occurring at other mines.* The district court admitted evidence of violence occurring at the premises of operators other than plaintiffs. Such evidence disclosed the broad pattern of defendant's campaign, with violence sufficiently spectacular and in such proximity to plaintiffs' operation as to become known to secondary employers and their employees and to induce them to discontinue mining or hauling coal for Flame. By Judge Weick's opinion in Osborne (p. 725) we held such evidence admissible.

■ (4) *Punitive damages.* The defendant claims that punitive damages were not recoverable. Under facts so similar to what the evidence here disclosed as to provide appropriate precedent, we held that it was permissible to allow punitive damages. United Mine Workers of America v. Osborne Mining Company, supra; Gilchrist v. United Mine Workers, supra. We need not here add to what was said in those cases.

(5) *Compensatory damages.* Aside from Flame's cost of repairing dynamited railroad tracks and wages paid to extra guards employed to guard its tipple, plaintiffs' evidence of compensatory damages consisted of an estimate of profits that they claim were lost by Flame, Amanda and Co-Dee as a direct result of. tortious conduct of the United Mine Workers. Defendant charges that the evidence of loss of profits was too speculative and conjectural to permit a jury to award damages therefor. Defendant further asserts that there was not sufficient evidence of previous profitable operations by plaintiffs in the locality where the tort was committed to justify the award made.

Virginia Collins was the controlling shareholder of the three corporations who were operating in Letcher County at the time of the events described in the evidence. Co-Dee was organized in 1954 and carried on the mining and selling of coal in counties neighboring on Letcher County. It had an operating loss at the end of its fiscal year ending on July 1, 1955.

In the next year it earned net income of $17,355.65, which was offset by a 1954 carry over loss. For the tax year ending July 31, 1957, it earned taxable income of $32,077.23. The tax returns for the next two years were not produced (claimed to have been lost) but Virginia Collins testified from memory that Co-Dee earned from eight to nine thousand dollars during such period. Amanda began its mining operations in counties near to Letcher County in October, 1957. Tax returns for its pre-1959 operations were not produced, but Virginia Collins testified it made a profit and that out of its earnings it had paid for a substantial amount of equipment. Flame was incorporated in September, 1958, and in that fall the three corporations moved their operations to Letcher County. The first deliveries of coal mined by Co-Dee and Amanda were made by Flame on December 30, 1958. In the succeeding months, Flame delivered about 33,000 tons of coal mined and delivered to it by Co-Dee and Amanda. There was evidence that Flame, at the beginning of the defendant's activities herein described, had orders for 267,500 tons of coal to be delivered over the balance of the year. There was testimony that the undelivered portions of these orders were cancelled because of Flame's inability to make required deliveries during the continuance of defendant's charged tortious activities. Miss Collins gave testimony of the price Flame was to pay for the coal delivered to it by Co-Dee and Amanda.

■ An accountant testifying for plaintiffs worked up a schedule (Exhibit 26) purporting to compute the profits lost by the three companies from the cancellation of Flame's orders. His calculations were based, in part, upon facts in evidence and, in part, upon his examination of books and records of the plaintiff companies. For reasons hereinafter stated in the next division of this opinion, we hold that Exhibit 26 was not the best evidence of all that it purported to show. We hold that, upon proper objection made, plaintiffs should have been required to identify and produce such of its

records as were not produced, but which were used by the accountant in constructing Exhibit 26. Using the calculations of his exhibit, the accountant witness projected an estimate of total loss of profits for the three companies at $228,190.63. The computations of the exhibit took into account the price of coal bought and sold by plaintiff companies, with estimates, based on past and current experience, of costs chargeable against expected receipts. We cannot say that, as a matter of law, such evidence (had Exhibit 26 been admissible) was wholly insufficient as a basis for the allowance of damages for lost profits.

In addition to proof of existing orders, plaintiffs produced evidence of leases held by them for coal lands which contained mineable coal in quantities ample to have permitted the filling of Flame's orders. There was evidence that at the beginning of this operation in Letcher County, the three companies had machinery and equipment for use in their operations, the total cost of which was $417,285.12.

■ We are aware of the general rule that damages for loss of future profits will not be allowed where their ascertainment must depend on speculation and conjecture. 15 Am.Jur. "Damages" § 150. If a new trial of this case is had and Exhibit 26 or its content is properly qualified for admission, there would, in our opinion, be sufficient evidence from which an award for compensatory damages for loss of profits could be awarded. The jury could find that plaintiffs suffered damages and that such damages were proximately caused by defendant's tortious misconduct. Uncertainty as to their amount will not foreclose recovery. In Story Parchment Co. v. Paterson Parchment Paper Company, 282 U.S. 555, 562–563, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548, the Supreme Court said:

"It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect to their amount. * * * Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

■ In United Mine Workers v. Osborne, supra, we said: "Profits are recoverable where there is an established business and they can be proven with reasonable certainty" (279 F.2d p. 727).

A method not unlike the plaintiffs' calculations here was employed to establish damages in Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 427 (C.A. 10, 1952). The damages sought were for loss of profits from sales that the injured party was deprived of. Holding the evidence sufficient, the court concluded, "They (the injured party) showed that they had the facilities, the personnel and the finances to manufacture and market the Dempsey products." In the case at bar, there was evidence that at the beginning of defendant's campaign of violence, plaintiffs had the facilities, the coal leases, the orders for coal and other necessary means to pursue a profitable operation. There was evidence of previous profitable operation, and while plaintiffs' operations in the county which was the situs of defendant's tort had continued for only a few months, it provided

some background for a projection of profits they would have enjoyed but for defendant's misconduct. Defendant attacked plaintiffs' calculations of future profits by cross examination of plaintiffs' witnesses and by opposing evidence which challenged the accuracy and validity of plaintiffs' assertions. It was for the jury to weigh the evidence and to draw such inferences and make such findings as were justified. Plaintiffs' estimate of lost profit was $228,190.63. The jury's award of compensatory damages was $54,845.00.

Kentucky decisions are not in conflict with our conclusion as to the sufficiency of plaintiffs' proofs of compensatory damages. Eastern Kentucky Lumber & Development Co. v. Waddell, 239 S.W.2d 68, 71 (Ky.1951); Union Cotton Company v. Bondurant, 188 Ky. 319, 323, 222 S.W. 66 (1920); Time Finance Company, Inc. v. Beckman, 295 S.W.2d 346, 350 (Ky.1956).

(6) *Admissibility of exhibit prepared from books and records not produced.* Within a few days before commencement of trial, defendant brought on for hearing a motion under Rule 34, F.R.Civ.P., for an order requiring plaintiffs to produce for inspection and copying all of their books and records relating to plaintiffs' operations for the period from 1954 through 1959. The motion was denied, primarily because the district judge felt that the motion came too late and would delay the trial. It was within the discretion of the district judge to deny such motion presented at the imminence of trial, and we find no error in such denial. Plaintiffs' counsel, however, at the time of the hearing of the motion offered to allow defendant's counsel to review plaintiffs' records.

Upon trial, plaintiffs produced an accountant who identified Exhibit 26, hereinabove referred to, as his computation of the profits lost by plaintiffs as a result of defendant's conduct. The document was entitled, "Schedule of Lost Profits in Coal Orders" and contained the witness' computation and recitation of all the elements necessary to the exhibit's con-

clusions. It covered the three plaintiff companies and treated of such items as depreciation, costs of all kinds, the selling and cost price of coal, and the tonnage claimed to have been lost. Its footings asserted profits lost by each company, with a grand total of $228,190.63. To qualify the exhibit, the witness testified, "The figures that I prepared were made from all available records of Amanda Coal Company, Co-Dee Coal Company and Flame Coal Company." Objection to the exhibit was made on the ground that the records from which the exhibit was prepared were the best evidence of their contents, and should be produced and identified to aid defense counsel's cross examination of the witness. The objection was overruled. The records were not produced. We find error in the admission of such exhibit.

This exhibit was important proof to sustain plaintiffs' claims for compensatory damages. The materials from which it was composed and which would support its validity were not produced. We are not impressed that the pretrial offer of plaintiffs' counsel to allow a general inspection of its records was a substitute for having the records available and identified at the trial. Defendant's counsel was entitled to review such records with particular reference to the exhibit offered. The accuracy of the underlying figures and factual assumptions, and the validity of the conclusions of the exhibit, could not be tested until the exhibit itself was seen and disclosure made of what was to be claimed for it. Cross examination of the witness producing the exhibit was frustrated by the absence of material claimed to support it.

While there was evidence that some of plaintiffs' records had been lost, there was no showing that the records employed by the accountant could not have been produced. It was plaintiffs' duty to do so if they desired to use the tabulation made therefrom.

Tabulations made by accountants from documentary material may be used, but the admissibility of such documents must first be established and, in

the absence of a showing that such material cannot be produced, they should be produced or made available at the time the tabulation is offered. 4 Wigmore on Evidence, § 1230, 3d Ed. Such is the rule in Kentucky. Harlan Coal & Coke Co. v. Davidson, 203 Ky. 580, 583, 262 S.W. 936 (1924); Edelen v. Muir, 163 Ky. 685, 688, 174 S.W. 474 (1915); Bush v. Board of Education, 238 Ky. 297, 311, 37 S.W.2d 849 (1931). The same rule has been applied in the Federal Courts, Morton Butler Timber Co. v. United States, 91 F.2d 884, 889 (C.A. 6, 1937); American Vitrified Products Co. v. Wyer, 221 F.2d 447, 453 (C.A. 6, 1955); John Irving Shoe Co., Inc. v. Dugan, 93 F.2d 711, 713 (C.A. 1, 1937); Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co., 80 F.2d 32, 44, 102 A.L.R. 688 (C.A. 8, 1935).

(7) *Nature of remand.* There was evidence that special damages to plaintiffs totalled $8,225.00; $1,225.00 as the cost of repairing railroad tracks and $7,000.00 for extra watchmen hired during the period of violence. All other compensatory damages claimed related to loss of profits. Without the information provided by Exhibit 26 (Schedule of Loss of Profits), there was not evidentiary foundation for an award of damages for lost profits. Holding that such evidence was inadmissible, we cannot affirm a judgment for compensatory damages in excess of the $8,225.00 special damages. We are of the opinion, however, that such holding does not require the unconditional granting of a new trial. Plaintiffs' proofs made out a strong case of liability, and justified an award of substantial punitive damages. We consider, therefore, whether it would be proper to affirm the judgment of the District Court if plaintiffs remit all compensatory damages in excess of the proven special damages. We have the authority to do so. Hansen v. Boyd, 161 U.S. 397, 411–412, 16 S.Ct. 571, 40 L.Ed. 746; Louisiana Power & Light Co. v. Sutherland Specialty Co., 194 F.2d 586, 587 (C.A. 5, 1952); O'Connor v. United States, 269 F.2d 578, 585–586 (C.A. 2, 1959).

Many courts have passed upon the necessity of an award of actual (compensatory) damages to support punitive damages and whether it is necessary that there be a proportional relationship between them. Some of their decisions are gathered in Annotations in 17 A.L.R.2d 527, and 33 A.L.R. 384. It is the general rule that punitive damages "must bear some relation to the injury inflicted and the cause thereof," 15 Am.Jur. "Damages" § 295. The above annotations, however, disclose a conflict in the decisions as to whether an award of punitive damages must be reasonably proportionate to the amount awarded for actual damages. Kentucky, whose law we follow on the question of punitive damages, has clearly announced its rule that an award of punitive damages need not bear a proportional relationship to the award of actual damages. Maddix v. Gammon, 293 Ky. 540, 543, 544, 169 S.W.2d 594; Louisville & N. R. R. Co. v. Ritchel, 148 Ky. 701, 147 S.W. 411, 41 L.R.A.,N.S., 958; Engleman v. Caldwell & Jones, 243 Ky. 23, 47 S.W.2d 971; Wigginton's Adm'r v. Rickert, 186 Ky. 650, 217 S.W. 933; Harrod v. Fraley (Ky.), 289 S.W.2d 203; Henderson v. Henderson Funeral Home Corp. (Ky.), 320 S.W.2d 113.

Kentucky follows the general rule that punitive damages must bear some relationship to the injury and the cause thereof. Louisville & N. R. R. Co. v. Ritchel, supra, 148 Ky. p. 706, 147 S.W. 411; Louisville Southern Railroad Co. v. Minogue, 90 Ky. 369, 14 S.W. 357; Louisville & N. R. R. Co. v. Roth, 130 Ky. 759, 768, 114 S.W. 264; Buford v. Hopewell et al., 140 Ky. 666, 131 S.W. 502. That is not to say, however, that a verdict for punitive damages must be proportionate to the amount of the award for actual damages.

In the case before us, excluding plaintiffs' Exhibit 26 (Schedule of Loss of Profits), there was evidence of serious injury to plaintiffs and much evidence of wilful and malicious conduct. Appellants do not charge that the award of $50,000 punitive damages was excessive. We are not persuaded that, had the District

Judge sustained the objection to Exhibit 26 and eliminated loss of profits from the jury's consideration, an award of $50,000 for punitive damages would have been unwarranted. We do not think, either, that we need to speculate whether the jury's award of punitive damages would have been in a smaller amount had it been restricted to an award of $8,225.00 for actual damages. A disparity between actual and punitive damages equal to the proportionate difference between $8,225.00 and $50,000.00 has been sustained by the Kentucky Court of Appeals, Louisville & N. R. R. Co. v. Ritchel, supra; Maddix v. Gammon, supra.

While we find no precise precedent for ordering a remission of a portion of the actual damages while sustaining an award of punitive damages, the case of Devine v. Patteson, 242 F.2d 828 (C.A. 6, 1957), supports our view that a remand as to actual damages does not require a retrial as to punitive damages. There, this Court was considering the claim that a jury verdict for $500.00 actual damages and $1.00 punitive damages was inadequate. The judgment as to compensatory damages for $500.00 was set aside as inadequate, and a new trial as to that issue only was ordered. The award as to punitive damages was not disturbed, Judge Allen saying, "As to punitive damages the award is peculiarly within the discretion of the jury. We cannot say that the discretion was abused, and we do not set aside the verdict of $1.00." In the case of Gerlach Live Stock Co. v. Laxalt (1930), 52 Nev. 191, 284 P. 310, that part of a judgment representing actual damages was vacated because the evidence thereof was inadmissible for not having been pleaded; a contemporaneous award for punitive damages, however, was sustained. In Engleman v. Caldwell & Jones, supra, the Kentucky Court of Appeals sustained a jury's verdict for $5,000.00 punitive damages, where $940.00 of an award of $2,340.00 of actual damages was remitted by plaintiff, evidently for failure of proof to support that amount.

Upon consideration of the whole record, we conclude that it would be a proper disposition of this matter to withhold the granting of a new trial, upon condition that plaintiffs remit all compensatory damages in excess of $8,225. It is, therefore, ordered that, if plaintiffs-appellees shall file in the District Court a remittitur in the sum of $46,620.00 from the judgment for compensatory damages, and shall cause a certified copy of such remittitur to be transmitted to this Court within thirty days of the filing of this opinion, the judgment of the District Court will be reduced to $8,225.00 compensatory and $50,000.00 punitive damages; and, as so modified, will be affirmed. Upon failure of proof of such remittitur in the manner and time above provided, the judgment of the District Court shall stand reversed with new trial ordered.

Costs of this appeal will be borne by plaintiffs-appellees.