319 F.2d 594
 Joe R. ALLEN, and Margaret S. Allen, d/b/a Allen Trucking Company, Kyle E. Duncan, Walter Melhorn, Jr. and Henry Melhorn, Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.
Lyle F. KENNEDY, d/b/a Lyle's Coal Company, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.
 No. 15108.
 No. 15109.
 United States Court of Appeals Sixth Circuit.
 June 26, 1963.
 
 E.H. Rayson and R.R. Kramer, Knoxville, Tenn., for defendant-appellant, and Willard P. Owens, Washington, D.C., on the brief.
 Robert S. Young, Jr., Howard H. Baker, Jr., Knoxville, Tenn., for plaintiffs-appellees.
 Before CECIL, Chief Judge, WEICK, Circuit Judge, and McALLISTER, Senior Circuit Judge.
 McALLISTER, Senior Circuit Judge.
 
 
 1
 The above cases, embracing four parties plaintiff, were tried together and verdicts, including compensatory and punitive damages, were returned by the jury. Prior to trial, plaintiff Duncan consented to his dismissal from the suit. The controversy grew out of the claimed destruction of plaintiffs' businesses and property during the course of labor conflicts in the coal-mining districts of Anderson County, Tennessee, in which the United Mine Workers of America, hereafter referred to as UMW, was alleged to have wrongfully caused the damage.
 
 
 2
 The incidents involved in this suit took place in the New River-Oliver Springs area, a somewhat remote valley in the northern part of Anderson County, Tennessee. It is bounded on either side by mountains; on the west by Petros Mountain, and on the east by Ligia's Fork. A stream, the New River, runs from Petros Mountain through the valley, and is paralleled by State Highway 116. The New River area contains a number of coal mines. Its principal settlements are, from west to east, Fork Mountain, Bufdalo, Moore's Camp, Devonia, and Rosedale — all mining camps and mining towns.
 
 
 3
 In 1958, appellee Lyle Kennedy obtained a coal lease of some eighteen hundred acres in New River, and commenced strip-mining operations there in January, 1959. Appellee Allen was a trucker, engaged in hauling coal, as were the other appellees, the Melhorns. For several years prior to 1959, most of the deep mines in the New River area of Anderson County had been worked out; and scattered strip-mining operations had largely occupied the territory. Appellee Kennedy was near the upper end of the valley and had the coal field closest to Kingston. The purchaser of Kennedy's coal was the Kingston Steam Plant, operated by the Tennessee Valley Authority. The purchaser, being a governmental agency, operated under the Walsh Healy Act, requiring the payment of a minimum wage scale for mining of coal in that area of $2.74½ per hour.
 
 
 4
 Appellee Kennedy had previously been engaged in strip-mining operations in Virginia. In New River, his employees, from seven to ten in number, did not belong to a union; and Kennedy operated on a non-union basis.
 
 
 5
 It appears that in the Fall of 1958, the UMW amended its national agreement and a number of mining operators in District 19, embracing the State of Tennessee, executed the amended agreement. However, some hundreds of operators in the District did not execute the new agreement, and letters of termination of the existing collective bargaining agreement were, accordingly, sent to them by the UMW. None of this directly affected appellee Kennedy who had never been operating on a union basis. At the end of the sixty-day notice of termination of the collective bargaining agreement, many of the operators of the union mines continued in their refusal to modify the existing agreement; and, as a consequence, their employees went out on strike.
 
 
 6
 On May 30, 1959, a motorcade, led by Field Representative Ed Ross of District 19 of the UMW, came through New River. That afternoon, on the road leading from appellees' mine to the Kingston Steam Plant, there followed picketing of the coal-carrying trucks by forty or fifty men. Threats were made by the pickets that the truck drivers "better get the hell out of there if we didn't want our trucks tore up." The truckers were ordered to dump their loads of coal, which they did. The pickets remained there night and day for at least a week, with the purpose, in the words of their leader, Floyd Blankenship, of "trying to find out who was union coal and who wasn't union coal." Blankenship had been a member of the UMW and had retired from mining on February 27, 1959. In April and May, 1959, he was a salaried deputy sheriff in New River. The pickets stopped the trucks and checked the tickets to see where the coal was coming from. Of all the strip-mining operators, only one, who had signed the UMW contract, was allowed to have his coal pass the pickets. They threatened appellee Henry Melhorn that they would throw him into a fire they had burning near the road if he undertook to haul any more nonunion coal. On April 1, another motorcade, led by Floyd Blankenship and John Siebers, originated in the Fork Mountain community of New River and of Petros Mountain, and was composed of men gathered from both places. Siebers was a constable who was also president of the local UMW Union in 1959. When one of the Melhorns started to get out of his truck to see why his brother's truck had been stopped, Siebers "pulled a gun out and told him not to get out of the truck." On May 11, appellee Kennedy was arrested by Floyd Blankenship for carrying arms on the public highway. It appears that two days after appellee Kennedy was arrested and had his firearms taken from him, one of the trucks carrying his coal was hit by two shotgun blasts and two rifle bullets, and sticks of dynamite had also been thrown on the bed of the same truck. When Blankenship arrested appellee Kennedy, he told him he could eliminate some of "these harassments" by signing a contract with UMW. Kennedy had been carrying the guns, not on the public highway, but on his own mining property. The guns were later returned to him, he was never convicted of any offense.
 
 
 7
 There was testimony from several witnesses that Field Representative Ross had arranged for the purchase of gasoline to be paid from Union funds for persons who were using their cars for picket-line duty. Three witnesses on behalf of appellees were UMW members of the group that stopped the trucking of coal by W.R. Parton, by dumping the trucks. They made up part of the pickets on top of Petros Mountain; and these men were members of the Union for whom Field Representative Ross had made arrangements to secure gasoline. The dumping of the Kennedy and Parton coal had resulted in the truck drivers' refusing to transport coal because of fear, from threats, and from the shootings. There was evidence that, during approximately the same time as the dispute with Kennedy, the property of another operator was being destroyed by dynamite, which added to the terror that caused a considerable cessation of operations. Field Representative Ross of the UMW told one trucker that Kennedy had not signed up with the Union, and that the UMW "didn't intend for them to operate until they had signed up," and that if the trucker "did not want to get into trouble, not to go there." To a miner, Ross declared that Kennedy was not going to work until he had signed a contract.
 
 
 8
 The Union's interest in the 1959 "no contract no work" campaign in this region of Tennessee was demonstrated in the recent cases in this Court of White Oak Coal Company, Inc. v. United Mine Workers of America, 318 F.2d 591 (C.A. 6) and Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.A.6).
 
 
 9
 The evidence and all inferences to be drawn therefrom, which must be viewed in the light most favorable to the prevailing parties and in support of the verdict, disclose threats, shootings, and dynamiting, similar to the surrounding circumstances in many other cases heretofore considered by this Court, and resulted in terrorism exerted over the independent truckers whose services were necessary in carrying on the mining operations, and in the stoppage and substantial cessation of mining and trucking operations in this case. Whether the Union authorized or encouraged interference with the coal mining and coal hauling in this case, was a question for the jury. White Oak Coal Company, Inc. v. United Mine Workers of America, supra; Sunfire Coal Company v. United Mine Workers of America, 313 F.2d 108, 109 (C.A.6); Flame Coal Company v. United Mine Workers of America, 303 F. 2d 39, 43 (C.A.6).
 
 
 10
 A review of the record establishes that the District Court did not commit reversible error in admitting in evidence various statements of Floyd Blankenship and John Siebers. They were both UMW pensioners, former presidents of the Local of the Union, and closely associated with the group of pickets. The jury could take their statements into consideration because of their common purpose with that of the Union, and their action on behalf of the Union in stopping coal production because an operator was proceeding without a Union contract.
 
 
 11
 As to the claim of error on the part of the District Court in submitting to the jury the question whether UMW violated certain criminal statutes of the State of Tennessee, that issue has been resolved adversely to appellant's present contention in White Oak Coal Company, Inc. v. United Mine Workers of America, 318 F.2d 591 (C.A.6).
 
 
 12
 The Union may be held liable for compensatory, as well as for punitive, damages when its responsibility is based upon the acts of individual officers, agents, or members. The Court charged:
 
 
 13
 "If you find that the Union, through its officers, agents, and members, combined with a common purpose to do any of the wrongful acts alleged, then you may consider all the evidence to determine whether the acts were done in concert in accordance with the common purpose and to effectuate a common design and, if damage to the plaintiff's property or business resulted directly or proximately you may consider whether the defendant was responsible for the damage and injury." There was no error in the foregoing instruction, or in the award of punitive damages. See White Oak Coal Company, Inc. v. United Mine Workers of America, supra.
 
 
 14
 We have reviewed the evidence with regard to the injury claimed to have been suffered by appellees who were coal truckers. They sued primarily for the interruption and destruction of their truck-contracting businesses, as well as for property damage. In support of their contention that the question of their damages was for the jury, appellees refer to Union Carbide and Carbon Corp. v. Nisley, 300 F.2d 561, 595 (C.A.10), in which Chief Judge Murrah, speaking for the Court, said:
 
 
 15
 "We know that loss of profits and diminishment of assets are proper elements of damage, and we know too that the owner of the affected business is competent to testify concerning his opinion of damages. * * * There was, to be sure, testimony to the effect that the mill never earned a profit at any time, even under the Toll Agreement, and that it failed by reason of economical and technological factors, of which the appellants had no control whatsoever. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Atlas Building Products Co. v. Diamond Block & Gravel Co., [10 Cir., 269 F.2d 950], supra; Twentieth Century-Fox Film Corp. et al. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846. But, all of these discrepancies, inconsistencies, and even incongruities were for the jury, * * *."
 
 
 16
 On the question of compensatory damages, we find no error in the Court's instructions or in the jury's verdict in accordance therewith, or in the Court's denial of appellant's motions for judgment and for a new trial.
 
 
 17
 In accordance with the foregoing, the judgment of the District Court is affirmed.