Paul GIBBS

v.

UNITED MINE WORKERS OF AMERICA.

Civ. A. No. 3771.

United States District Court
E. D. Tennessee, S. D.

July 18, 1963.

VanDerveer, Brown & Siener, Chattanooga, Tenn., for plaintiff.

Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., for defendant.

FRANK W. WILSON, District Judge.

This case is now before the Court upon the motion of the defendant, United Mine Workers of America, for either a judgment notwithstanding the verdict or for a new trial. Upon trial of the case the jury found in response to special issues that the defendant, United Mine Workers of America, hereinafter referred to as "UMW," had violated the so-called secondary boycott provisions of the Taft-Hartley Act (29 U.S.C. § 187) and had committed the tort of unlawful interference with the plaintiff's contract rights, and awarded the plaintiff compensatory and punitive damages in the total sum of $174,500. Some of the background to this lawsuit is undisputed in the record and may be stated as follows. Tennessee Consolidated Coal Company, hereinafter referred to as "Consolidated," owns extensive coal lands in the Southeastern Tennessee Coal Fields and over a period of many years has engaged both directly in the mining of coal and in the leasing of coal lands to others to mine. Prior to March 15, 1960, Consolidated had operated a mine in Marion County, Tennessee, known as the Coal Valley Mine, this mine being operated under a collective bargaining agreement with the UMW. The Coal Valley Mine was closed down by a strike upon that date when negotiation of a new collective bargaining contract failed after termination of the former contract by Consolidated in accordance with its terms.

In August of 1960 Grundy Mining Company, herein referred to as "Grundy," a wholly owned subsidiary of Consolidated, took steps to open new mines in the Gray's Creek Area of Marion County, Tennessee, within the general vicinity of the Coal Valley Mine and upon Consolidated coal lands. In preparation for opening these new mines Grundy agreed to employ Paul Gibbs, the plaintiff herein, as mine superintendent at a salary of $600 per month. At the same time Gibbs asked for the contract to haul the coal from the new mines at a price of 78¢ per ton and this was also agreed upon by the parties. Both the employment contract and the trucking contract were for an indefinite period. Gibbs' background was that of a coal operator and trucker.

Grundy proposed to open the new mine in the Gray's Creek Area without a contract with the UMW. Upon Monday, August 16, 1960, the first day work was scheduled to begin, Gibbs and a few others appeared for work, but picketing and a show of force took place by UMW members who were former employees of the Coal Valley Mine and no work was done. Violence or threatened violence continued the next day and all efforts by Grundy to open the mines in the Gray's Creek Area appear to have ceased after the second or third day. The picketing continued from August 1960 until the following May 1961. Gibbs drew one check of $300 under his salary agreement. He never got to haul any coal under his trucking contract with Grundy. In May of 1961 Consolidated contracted with a firm by the name of Allen & Garcia, an engineering firm, as operators to reopen the Coal Valley Mine and this was done by Allen & Garcia under a collective bargaining agreement with UMW. This lawsuit was begun in August of 1961, but to carry events down to the time of the trial, it appears that the Coal Valley Mine continued in operation by Allen & Garcia under contract with the UMW until it was closed in the early summer of 1962 when a fault in the coal seam was struck. Thereupon Allen &

Garcia opened a new mine in the Gray's Creek Area and moved the Coal Valley equipment and personnel to the new mine. In September of 1962 Allen & Garcia terminated its operating contract with Consolidated and gave notice of termination of the UMW contract. Grundy thereupon took over the Gray's Creek operation, and in addition opened some seven or eight hand loading mines in the area, but did not further employ Gibbs in any of these operations.

This lawsuit was begun upon August 23, 1961, when the plaintiff, Gibbs, filed suit herein against the UMW seeking to recover compensatory and punitive damages and alleging that UMW had violated Section 303 of the Taft-Hartley Act (29 U.S.C. § 187) and was guilty of a common law conspiracy aimed at him. The case was tried by the plaintiff upon the theory that the UMW had directed its unlawful activities toward various coal operators with whom Gibbs had business dealings or with whom he anticipated doing business, including Grundy, Consolidated, Tennessee Products and Chemical Company, and one George Ramsey, in an alleged effort to cause them to cease doing business with him or to refuse to do business with him. At the conclusion of all of the evidence the Court concluded that the evidence was insufficient to warrant submitting to the jury the issues with reference to any losses sustained by the plaintiff by reason of any UMW activities directed toward inducing Consolidated, Tennessee Products & Chemical Company and George Ramsey to either cease or refuse to do business with Gibbs, but rather that the case should be submitted to the jury only with reference to any compensatory or punitive damages the plaintiff might be entitled to recover by reason of UMW activities alleged to have been directed toward having Grundy terminate its employment contract and its trucking contract with Gibbs.

The case was submitted to the jury upon a number of special issues. The jury found all issues in favor of Gibbs and against the UMW and awarded com-

pensatory damages to Gibbs in the sum of $60,000 for termination of his employment contract with Grundy, and in the sum of $14,500 for termination of his trucking contract with Grundy and awarded punitive damages to Gibbs in the sum of $100,000, for a total award of $174,500 to the plaintiff.

A number of grounds in the defendant's motion for a judgment notwithstanding the verdict, or in the alternative for a new trial, are directed toward alleged errors in the jury verdict in finding that the defendant violated the secondary boycott provisions of the Labor Management Relations Act. It is the contention of the defendant in this regard that under the evidence in this case there either was no secondary boycott as a matter of law, or that the evidence preponderates against such a finding. It is the contention of the defendant that no violation by it of 29 U.S.C. § 187 (Sec. 303 of the Labor Management Relations Act as amended) was shown in the evidence as (1) there was no evidence that the defendant was responsible for the activity alleged to constitute a secondary boycott, and (2) any loss occasioned the plaintiff was at most the result of primary union activity and not the result of any secondary activity for the reason that (a) such activity was limited to the premises of Grundy Mining Company, the employer with whom the dispute existed, (b) the object of the activity was clearly to further claimed job rights with Grundy, and not to induce Grundy to cease doing business with Gibbs, (c) the plaintiff, as mine superintendent for Grundy, was not such "other" or "neutral" person as to be the object of a proscribed secondary boycott, but rather was a part of Grundy, the primary employer.

■■■ Considering the defendant's contentions in the order stated above, the Court is of the opinion that there was sufficient evidence in the record to warrant submitting to the jury the issue of the defendant's responsibility for activity alleged to constitute secondary boycott. By stipulation UMW admits its responsi-

bility for acts of its field representative, George Gilbert, performed in the scope of his employment. Without now determining whether the evidence was sufficient to permit a jury finding that UMW was responsible for the activities and violence testified to as having occurred in the Gray's Creek Area upon August 15 and 16, 1960, it appears undisputed that the UMW became aware of such activities by the 16th. There is evidence upon which the jury could find that thereafter Gilbert participated in and supported, if not controlled, the picketing that occurred. The witness, Swope, testified that George Gilbert gave instructions to the pickets to permit Swope to pass through the picket line. The witnesses, Gibbs, Campbell, and Higgins, each testified to conversations with George Gilbert during the course of the picketing indicating his support of the picketing and his direction of union activities toward the end of preventing Gibbs from working for Grundy or from bringing into the Gray's Creek Area the Southern Labor Union, a competitive union. Whether Gilbert or the UMW was or was not responsible for any violence or threats of violence that may have occurred either before or after August 16 is not controlling on the issue of secondary boycott, as it is the object of the union activity that constitutes the essence of the unfair labor practice involved in a proscribed secondary boycott. As stated in the case of N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, at 672, 71 S.Ct. 961, at 964, 95 L.Ed. 1284:

" * * * violence on the picket line is not material. (and) * * * would not in itself bring the complained-of conduct into conflict with § 8(b) (4). It is the object of union encouragement that is proscribed * * * rather than the means adopted to make it felt."

The UMW next contends that Gibbs' loss of employment and loss of his trucking contract would at most be the result of primary union activity directed toward Grundy, and therefore not actionable under 29 U.S.C. § 187, as the union activity was limited to the premises of Grundy. In support of its position in this regard, the defendant relies principally upon the case of Electrical Workers v. National Labor Relations Board (cited as Local 761 etc. v. N. L. R. B.), 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed. 592, which it is contended holds that picketing at the situs of the primary employer does not violate the secondary boycott provisions of Sec. 8(b) (4) (A) of the National Labor Relations Act [29 U.S.C. § 158(b) (4) (A)]. It is believed by the Court that the holding in the Electrical Workers case is not controlling under the facts and circumstances of the principal case. That case involved a review of a National Labor Relations Board decision that held that picketing of the primary employer, General Electric Company, that extended to a gate not used by employees of the primary employer, but which was rather used only by employees of independent contractors of General Electric Company, was an unfair labor practice under Sec. 8(b) (4) (A) in a labor dispute between the union and General Electric Company. The Supreme Court affirmed this holding with the proviso that should it be made to appear that the independent contractors' employees performed work to a substantial extent that contributed to the normal operations of General Electric Company, then the picketing of such employees' gate would not constitute an unfair labor practice. In distinguishing the case it must be remembered that a Board decision and not a jury verdict was there involved and the appellate review is not the same. Even if the Electrical Workers opinion were, as contended by UMW, authority for the proposition that picketing at the situs of the primary employer could not constitute a Sec. 8(b) (4) (B) unfair labor practice though it had a secondary effect upon others, this is not decisive of the issues in the principal case. No issue was involved in the Electrical Workers case but that General Electric was the object of the primary activity, whereas whether Grundy was the object of primary or sec-

ondary activity or both is one of the disputed issues in the principal case. No issue was there involved but that all union activity occurred on the premises of General Electric Company, the primary employer, whereas the activity complained of in the principal case occurred at various places at various times. The statement in the Electrical Workers case that "the distinction between legitimate 'primary activity' and banned 'secondary activity,' does not present a glaringly bright light" is an effective understatement of the complex and vague wording of the sections of the Act here involved. The Court there likewise pointed out that the meaning of the secondary boycott provisions of the Act must be worked out with reference to the facts of a particular case rather than in the statement of all-inclusive principles when it stated:

"The nature of the problem, as revealed by unfolded variant situations, inevitably involves an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer."

While the situs of the union activity would be evidence which the Jury might properly consider in determining the object of such activity, where the object is in issue, the situs is not itself controlling in establishing a secondary boycott.

■■■ The essence of the statutory language pertinent to the issues of this lawsuit, when stripped of all non-applicable phrases and when stripped of references to interstate commerce, is as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) (i) to engage in, or to induce or encourage any individual * * * to engage in, a strike or refusal in the course of his employment * * to perform any services; or (ii) to threaten, coerce, or restrain any person * * *, where in either case an object thereof is—* * *

"(B) forcing or requiring any person to * * * cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *."

When viewed in its essence, it is apparent that the specified union activity becomes unlawful and therefore actionable as a secondary boycott, when an *object* of such union activity is to force or require any person to cease doing business with any other person, provided that the activity is not a primary strike or primary picketing, having only an incidental or secondary effect upon the other person. In this regard it is necessary to distinguish between primary activity having a secondary effect upon others, which is not actionable,[1] and activities directed toward one person and having as an object the causing of that person to cease doing business with another person with whom a primary labor dispute exists, which is actionable.[2]

---

1. Local 761, International Union of Electrical, Radio and Machine Workers, AFL-CIO v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed. 592 (1961); Seafarers International Union of North America, Atlantic and Gulf Dist., Harbor and Inland Waterways Division, AFL-CIO v. N. L. R. B., 105 U.S.App. D.C. 211, 265 F.2d 585 (1959).

2. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (C.C.A.6, 1959) cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038; United Mine Workers of America v. Os-

borne Mining Co., 279 F.2d 716 (C.C.A. 6, 1960) cert. denied 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103; Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.C.A.6, 1961) cert. denied 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76; Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (C.C.A.6, 1962); Sunfire Coal Co. v. United Mine Workers of America, 313 F.2d 108 (C.C.A.6, 1963); White Oak Coal Co., Inc. v. United Mine Workers of America, 318 F.2d 591 (C.C.A.6, 1963); Allen et al. v. United Mine Workers of America, 319 F.2d 594 (C.C.A.6, 1963).

■ The UMW next contends that under the facts of the principal case any union activity would in no event be actionable under 29 U.S.C. § 187, as the object of the activity was clearly to further claimed job rights with Grundy, and not to induce Grundy to cease doing business with Gibbs. As stated above in discussing the issue of UMW's responsibility for any activity, the witnesses, Gibbs, Campbell, and Higgins, each testified to statements having been made by George Gilbert that would indicate that his purpose or object was to prevent Gibbs from working for Grundy or from bringing into the Gray's Creek Area the Southern Labor Union. This evidence would support the jury verdict when it found that an object of the union activity was to cause Grundy to cease doing business with Gibbs with respect to both his employment contract and his trucking contract. The fact that the union may have had some object or objects other than and in addition to causing Grundy to cease doing business with Gibbs would not prevent the activity from constituting a secondary boycott insofar as Gibbs was concerned, and therefore actionable by him as such. As stated in the case of Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (C.C.A. 6, 1962)

> "This union cannot escape the charge of secondary boycott because it chose to attack on all fronts at once, claiming its desire and objective to be the organization of all involved, whether producers, transporters or processers of coal. United Mine Workers of America v. Osborne Mining Co., 6 Cir., 279 F.2d 716, 723."

Finally, upon the issue of secondary boycott it is contended by the defendant that any union activity here involved would in no event constitute an actionable secondary boycott as to Gibbs for the reason that, as mine superintendent for Grundy, he was not such an "other person" within the contemplation of Sec. 8(b) (4) (B) as to be the object or victim of a proscribed secondary boycott, but rather he was a part of Grundy, the primary employer. The relationship of Gibbs to Grundy, namely that he was hired as mine superintendent for Grundy and as a contract coal hauler, is undisputed in the record. Therefore, whether he is or is not such "other person," the ceasing of business with whom may constitute an actionable secondary boycott, is a question of law.

■ If the language of the statute is to be literally interpreted, then Gibbs is clearly an "other person" from Grundy, as would be any officer or employee of Grundy. However, as stated in Local 761, International Union of Electrical, Radio and Machine Workers, AFL–CIO v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed. 592:

> "This provision could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called primary activity."

Likewise, as noted in Seafarers International Union of North America, Atlantic and Gulf Dist., Harbor and Inland Waterways Division, AFL–CIO v. N. L. R. B., (1959) 105 U.S.App.D.C. 211, 265 F.2d 585, when read literally, the Act would outlaw picketing at the primary employer's premises so that the language must be construed in the light of Congressional intent and in the light of the proviso that nothing in the Act shall be construed to make any primary strike or primary picketing unlawful.

In support of its contention that Gibbs is not such "other person" from Grundy as to be the object of a secondary boycott for activities directed at Grundy, the defendant relies principally upon the case of Seeley v. Brotherhood of Painters, 308 F.2d 52 (5 C.C.A., 1962). In that case the plaintiff, in one of several counts, alleged that he had a cause of action against the defendant union under 29 U.S.C. § 187 in that the defendant caused the plaintiff's employer to discharge him. The Court, in holding that the count failed to state a cause of action, stated that discharging an employee did not constitute "[ceasing to do] business with

any other person" stating further "We do not think that the relation of employer and employee, including one employed as a supervisor, is that of 'any other person' within section 158(b) (4)." The Court reached this conclusion on the ground that "[n]o secondary boycott was involved in this case," which is rather unsatisfactory reasoning in that it begs the question.

The defendant relies upon other authority as requiring that the plaintiff be a "neutral" before he is entitled to the benefit of the statutory secondary boycott action.[3] That this is not an accurate statement of law is apparent when it is recalled that 29 U.S.C. § 187(b) provides that *whoever* shall be injured" by a secondary boycott may recover, including the employer with whom the primary dispute exists.[4] While the word "neutral" may be useful in identifying a case of secondary boycott in a clear and classical case of secondary boycott, little help is needed in identifying a clear and classical secondary boycott. The word "neutral" can be misleading in other situations, as for example where the union strikes on all fronts at once, as was the case in Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (C.C.A. 6, 1962), where the Court held that such union activity did not escape the charge of secondary boycott. If two employers each simultaneously has a dispute with the same union, they may be neutral as to each other's dispute, but they are in no sense neutral as to the union.

While a correct result may have been reached in each of the foregoing cases relied upon by the defendant as authority for excluding an employee or supervisor from the meaning of "other person" in Sec. 8(b) (4) (B), the reasons given for reaching such conclusion are often unsatisfactory. Reference to the full wording of the section will more properly reveal the meaning that must necessarily be placed upon the words "other person." When it is noted that the proviso expressly excludes primary strikes and primary picketing, it is apparent that employees and supervisors of any struck or picketed primary employer who may lose their employment are not within the meaning of "other persons" and would have no statutory action for any loss so occasioned.

It is apparent from the foregoing that Gibbs, in his capacity as mine superintendent for Grundy, would not be an "other person" as those words are used in the statute. Although, as found by the jury, an object of the picketing of Grundy was to cause it to cease employment of Gibbs, and Grundy may have been "neutral" or secondary to the dispute between UMW and Gibbs, there also clearly existed a primary dispute between UMW and Grundy. It follows that the verdict of the jury awarding damages to Gibbs upon his statutory claim for loss of employment must be set aside.

It does not necessarily follow, however, that, even though Gibbs in his capacity as a mine superintendent and in his claim for loss of employment is not an "other person" from Grundy, that he is therefore in his capacity as a coal trucker and in his claim for loss of the trucking contract not an "other person" from Grundy. The evidence is undisputed that Gibbs was an independent trucker engaged in this business with and for persons and companies other than Grundy. He did not work only for Grundy in this respect. It would therefore appear that in his capacity as an independent trucker he would be an "other person" from Grundy and would be entitled to a statutory action under the secondary boycott law upon this claim.

3. Truck Drivers and Helpers Local Union No, 728, Affiliated with Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Empire State Express, 293 F.2d 414 (5 C.C.A.1961) cert. denied 368 U.S. 931, 82 S.Ct. 365, 7 L.Ed.2d 194 (1961); Building Service Employees International Union Local 32–J, AFL-CIO v. N. L. R. B., 313 F.2d 880 (D.C.Cir., 1963); International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 181 F.2d 34 (C.C.A.2, 1950).

4. See cases cited in Footnote # 2, supra.

■ Having determined that the jury verdict should be sustained as to the statutory cause of action for loss by Gibbs of his trucking contract, it would follow that the defendant's contention that the Court was without jurisdiction of the common law conspiracy action must fail.[5] Even though the federal statutory action should fail both upon the employment and the trucking claim, it cannot be said that the federal question was plainly wanting in substance. Under these circumstances, in accordance with the case of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, the Court would retain jurisdiction to dispose of the non-federal common law claim.

■ Another series of grounds in the defendant's motion for a judgment n.o.v. or a new trial are directed toward alleged errors in the jury verdict in finding that the defendant conspired to wrongfully interfere with the plaintiff's employment contract and coal hauling contract with Grundy. It is the contention of the defendant in this regard that the evidence fails to support the jury verdict, particularly in view of the legal principles that (a) the evidence must be clear and convincing for a labor union to be held responsible in a federal court action, in view of Section 6 of the Norris-LaGuardia Act; (b) a union is under no legal obligation to disavow unlawful acts of its members; (c) welfare assistance given members, including pickets, by the union does not constitute ratification of any unlawful conduct by such members or pickets; and (d) federal law has preempted the field of non-violent picketing so that no verdict could be awarded upon a state common law conspiracy charge not based on violence. The jury was correctly charged upon all of these matters. The Court is of the opinion that there is evidence in the record, when the testimony is viewed as a whole, to support the verdict of the jury in this respect. The contention that 29 U.S.C. § 187 and the other provisions of the National Labor Management Relations Act preempted the field of labor controversy or precluded any common law action of conspiracy has been decided against the UMW in several cases in this circuit, the most recent being the case of White Oak Coal Co. v. United Mine Workers of America, 318 F.2d 591 (C.C.A. 6). Moreover, there was evidence of violence, threats of violence, and mass picketing, any of which was such unlawful conduct as to support a verdict based upon common law conspiracy.

■ A further series of errors alleged by the defendant are directed to the Court's charge to the jury. It is the contention of the defendant that the Court was in error in declining a special request of the defendant relating to a requirement that a neutral exist before an actionable secondary boycott would exist. The Court has hereinabove dealt with the possible misleading nature of the word "neutral" when used in defining a Sec. 8(b) (4) unfair labor practice. It is believed that the charge as given correctly defined the statutory claim. Moreover, the action of the Court in setting aside the jury verdict on the statutory claim of interference with the plaintiff's employment contract would render this ground of the defendant's motion moot. The other alleged errors in the charge were matters not raised at the time of the trial as required by Rule 51, Federal Rules of Civil Procedure. It is believed that in any event no error was committed in the matters complained of.

■ A further ground for new trial relied upon by the defendant is the alleged improper argument of the plaintiff's counsel in his closing argument. Among other remarks, counsel for the plaintiff accused the defendant of not caring a snap of the fingers for the law and of attempts to bludgeon or starve his client out of the lawsuit. The Court is of the opinion that the argument was im-

5. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (C.C.A.6, 1959) cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038; Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (C.C.A.6, 1962).

proper. While an advocate may share his client's prejudices against an adversary, he cannot properly share them with the jury, particularly when they do not relate to any matters in evidence. However, the Court is of the opinion that the argument was not so prejudicial as to warrant a new trial, but should rather be taken into consideration by the Court upon the issue of excessiveness of the verdict.

Further grounds relied upon by defendant in its motion relate to the alleged lack of evidence on the issue of damage and the alleged excessiveness of the verdict in this respect. The only evidence in the record that might support any recovery of damage with reference to the loss of the plaintiff's trucking contract was the plaintiff's own estimate of the profit he would have made on the contract, as set forth in plaintiff's Exhibit #34, in the amount of $14,029. His actual experience in the coal trucking business reflected substantial losses, rather than profits, for preceding years. Not only is there an absence of credible evidence to support the estimate, but the estimate is admittedly based upon carrying loads substantially in excess of the permissible weight limits applicable to the plaintiff's trucks under the laws of Tennessee. The issue here is not the validity or invalidity of the coal hauling contract, or the right of a third party, the UMW, to assert its invalidity, as apparently argued in the plaintiff's brief. The issue here is as to the probative value of the evidence of the loss of prospective profits when based upon prospective violation of truck weight laws. The Court is of the opinion that such evidence has no probative value.[6] Under these circumstances the record is devoid of any evidence upon which a jury might return a verdict awarding any damages for loss by the plaintiff of his trucking contract and the defendant's motion for a directed verdict upon this issue made at the conclusion of the evidence should have been sustained.

With respect to the verdict awarding damages unto the plaintiff for loss of his employment contract, the Court is of the opinion that there is evidence in the record upon which a verdict might be sustained. However, without here reviewing the evidence relating to damages sustained by reason of loss of the employment contract, other than to note that the employment contract was terminable at will by either party, the Court is of the opinion that the verdict of the jury upon this issue is clearly excessive to the extent of $30,000. Likewise in reviewing the evidence and reflecting upon the argument of the plaintiff's counsel to the jury, the Court is of the opinion that the jury verdict upon the issue of punitive damages is clearly excessive to the extent of $55,000. A remittitur in the sum of $30,000 upon the issue of loss of the plaintiff's employment contract and in the sum of $55,000 upon the issue of punitive damages is therefore suggested, or otherwise a new trial will be ordered.

The Court has reviewed Grounds 10, 11, 12, and 13 of the defendant's motion relating to the admissibility of various items of evidence upon the trial, and is of the opinion that these grounds are without merit and should be overruled.

It therefore results that the verdict of the jury in favor of the plaintiff on the issue of loss of the plaintiff's employment contract by reason of a statutory secondary boycott will be set aside. The verdict of the jury awarding damages unto the plaintiff on the issue of loss of the plaintiff's trucking contract by reason of both a statutory secondary boycott and a common law conspiracy will be set aside. The defendant's motion for a judgment n. o. v. upon these issues should be sustained. Unless the plaintiff shall agree to accept a remittitur of $30,000 in the jury verdict on the issue of damages by reason of loss of the plaintiff's employment contract as a result of a common law conspiracy and to accept a remittitur of $55,000 in the jury verdict

---

6. Shelley v. Hart, 112 Cal.App. 231, 297 P. 82 (1931). See also 25 C.J.S. Damages § 42b and 15 Am.Jur., Damages, Secs. 158, 159.

on the issue of punitive damages, the Court believes that these issues should be submitted to another jury and a new trial will be ordered.

An order will enter accordingly.