William G. GILCHRIST, Jr., William G. Gilchrist, III, and James Blythe, Trustee for Robert A. Gilchrist, a Minor, Partners, d.b.a. Gilchrist & Sons; and G & R Coal Co., Inc., Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

SNYDER AND RANDOLPH, INC., Plaintiff-Appellee,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

Nos. 14379, 14380.

United States Court of Appeals
Sixth Circuit.

May 1, 1961.

Logan E. Patterson, Pineville, Ky. (James S. Greene, Jr., Harlan, Ky., Robert S. Young, Jr., Howard H. Baker, Jr.; Baker, Young, Young & Baker, Knoxville, Tenn., on the brief), for appellees.

E. H. Rayson and R. R. Kramer, Knoxville, Tenn. (Willard P. Owens, Washington, D. C., William J. Turnblazer, Middlesboro, Ky., Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., on the brief), for appellant.

Before McALLISTER, WEICK and O'SULLIVAN, Circuit Judges.

WEICK, Circuit Judge.

Gilchrist & Sons, a partnership, and G & R Coal Company, Inc., a corporation, instituted action in the District Court against United Mine Workers of America, a labor organization,[1] to recover compensatory and punitive damages for the alleged violation of the secondary boycott provisions of the Labor-Management Relations Act of 1947 as amended. 29 U.S.C.A. § 187. It was averred in the complaint that the plaintiffs were engaged in the mining of bituminous coal in the Jellico, Tennessee-Kentucky area; that in March 1959 and subsequent thereto UMW induced their employees to concertedly refuse to work on coal produced by other employers and induced the employees of other employers to concertedly refuse to work on coal which was to be brought to plaintiffs' premises; that the purpose of such conduct was to compel plaintiffs to bargain with UMW as the representative of their employees although the Union had not been certified as a representative of said employees by the National Labor Relations Board as required by the Act. Plaintiffs' causes of action were based on the provisions of the Act and also the common law of Kentucky and Tennessee.

Snyder & Randolph, Inc., a corporation, filed a similar action on the same day in the District Court.

The two cases were tried together by the District Judge without a jury from June 20, 1960 through June 30, 1960. The District Judge handed down a comprehensive opinion which contained a summary of the evidence and adopted forty-two findings of fact and twenty conclusions of law. It appears on seventy-nine pages of the printed record. The District Judge found in favor of all the plaintiffs; that Gilchrist & Sons, the partnership, is entitled to recover $239,000 compensatory damages and $79,000 punitive damages making a total of $318,000; that G & R is entitled to recover compensatory damages in the amount of $20,000 and $7,000 punitive damages making a total of $27,000; that Snyder and Randolph is entitled to recover compensatory damages in the amount of $101,000 and $33,000 punitive damages making a total of $134,000. Judgments were entered in favor of the plaintiffs in accordance with these findings.

The partnership owned valuable leases on coal mining lands comprising about 37,750 acres in the Jellico area. It also owned mining machinery, equipment and facilities. It had been engaged in the mining and sale of coal for several years. G & R was organized as a corporation in 1957. It was a closed corporation. The members of the partnership were its principal officers, directors and shareholders. Shortly after its organization G & R entered in a contract with the partnership whereby the partnership agreed to furnish G & R with sites in the Jellico area for the strip mining of coal and also to furnish and maintain the necessary machinery, equipment and facilities therefor, G & R, for a stipulated price, agreed to strip mine and prepare the coal furnishing all labor and

---

1. Gilchrist & Sons will be referred to herein as "partnership"; G & R Coal Co., as "G & R"; United Mine Workers of America as "UMW"; Snyder & Randolph, Inc. as Snyder and Randolph.

supervision therefor and to load the coal after preparation on the partnership's chosen method of conveyance. The partnership also subleased lands to G & R which in turn subleased to others for auger mining and deep coal mining. G & R subleased lands to Snyder & Randolph for auger mining. Snyder & Randolph entered into an agreement with the partnership to sell it all coal produced under the sublease and the partnership agreed to account for all sales less a commission of 5% for selling and 7½% for crushing and handling the coal. The coal mined by G & R and Snyder and Randolph was carried from the mines to tipples by independent truckers who were not employees of the plaintiffs.

Prior to the present controversy, G & R and its predecessor had signed the National Bituminous Coal Wage Agreement and various amendments with UMW. Some of its employees belonged to the Union, but a majority did not. The Union and the employees had little, if any, dealings and G & R paid the employees the same wages it paid its other employees engaged in road work without regard to Union pay scales and other conditions of employment. Snyder & Randolph had no contractual relationship with the Union although some of its employees were members.

In December 1958 UMW negotiated an amended wage agreement with certain coal operators and sent notice that any signers of the old agreement would be expected to sign the new amended agreement and the old agreement would be cancelled at the end of 60 days. G & R believed that it could not operate under the new amended agreement and refused to sign it. G & R notified UMW of its cancellation of the old agreement as of March 2, 1959. Snyder & Randolph likewise refused to sign the new agreement.

In February 1959, the agents and representatives of UMW began an intensive campaign in southeastern Kentucky and northeastern Tennessee to organize the field. They instructed G & R employees not to work after the old contract expired. They told Snyder & Randolph that if they did not sign the amended agreement "we will shut you down." They stated that they took orders from Washington and intended to use whatever means were needed to carry them out. They contacted truck owners and drivers and warned them not to deliver coal for G & R and Snyder & Randolph.

When peaceful persuasion failed other means were adopted. Truck drivers were stopped and ordered to dump coal in the street blocking the entrance to the tipple. Truckers were stopped in the streets and ordered to turn around and return to Jellico. A temporary restraining order was issued on April 30th by the United States District Court at London, Kentucky at the instance of the National Labor Relations Board restraining UMW from coercing or interfering with employees of the coal industry.

The federal court injunction did not stop the acts of violence which continued with unabated fury. On May 1, George Lindsey, a crusher operator of G & R was ambushed and shot at while on his way home after finding a barricade of trees and timbers on the public street which barred the path of his truck. Another employee was assaulted, beaten and rendered unconscious by the use of brass knuckles. On May 2, an independent trucker hauling coal for Snyder & Randolph was ambushed. Two tires were shot and one bullet entered the cab of his truck. On May 3, the truck of George Bray was dynamited at his home at midnight. A dynamite explosion took place at the home of Arnold Spradlin a few days after he had begun hauling coal for Snyder & Randolph. At midnight on May 6, 1959 two tipples or crushers belonging to the partnership were wrecked by dynamite explosions occurring from one to five minutes apart and were of sufficient force to break windows on the main street in Jellico about a block away. On June 4 a railroad trestle serving the tipple of Snyder & Randolph at Verne, Kentucky was destroyed by dynamite. On June 16 a large Compton auger owned by Snyder & Randolph which cost

about $90,000 was almost totally destroyed by dynamite.

The principal argument advanced by UMW, in its appeal, was that Gilchrist & Sons was not a party to the alleged secondary boycott and was not entitled to maintain an action under Section 303 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 187. It urges that it had no labor dispute with the employees of the partnership and were not attempting to organize them. UMW asserted other grounds of error, namely, that truck drivers engaged on a contract basis to haul coal mined by G & R were not "neutral" employees within the meaning of the Act; that the District Court had no jurisdiction to determine whether the evidence established a violation by UMW of the common law of Kentucky and Tennessee; that UMW could not be sued as an entity; that the District Court erred in holding UMW liable for damage to Gilchrist & Sons' tipple and Snyder & Randolph's auger; that the evidence does not support findings that UM W unlawfully interfered with and destroyed the business of Gilchrist & Sons, G & R and Snyder & Randolph; that the evidence does not justify the awards of damages to the several plaintiffs.

UMW relies on our decision in Love and Amos Coal Co. v. United Mine Workers, 279 F.2d 716, certiorari denied 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 in support of its contention that the partnership was not entitled to maintain an action in the District Court under the Labor-Management Relations Act of 1947. In that case Love and Amos had a verbal contract to sell coal for Osborne Mining Company for a commission. Love and Amos claimed damage not because of any activities of UMW directed against it, but on account of the destruction of the business of Osborne. Its theory was that it would have sold Osborne's coal and earned commissions if Osborne's business had not been destroyed by UMW. Love and Amos had sustained no direct damage by reason of any of the unlawful acts of UMW. Its damage was indirect and remote and not of the type contemplated to be remedied by the Labor-Management Act of 1947.

In the present case, the relationship between the partnership and G & R was much different than that existing between Love and Amos and Osborne Mining Co. The partnership here was a principal and not an agent. It had an established coal business and sold its own coal. It owned the leases, coal, mining machinery, equipment and facilities. In fact, the partnership had an integrated coal business in which only the actual mining was delegated to an instrumentality (G & R) controlled by its members. Activities of UMW were directed at the partnership.

■ The damage sustained by the partnership was direct and not remote, indirect or incidental. Its physical property was damaged by the dynamiting. Its coal business was disrupted and destroyed. It did not claim damage because of the destruction of the business of G & R as in Love and Amos. In our opinion, the plain language of the Act "whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue * * " authorized the suit by the partnership which was directly injured in its business and property by reason of the violation of the Act by UMW.

■ With respect to the other claims of error assigned by UMW, we are of the opinion that the findings of fact adopted by District Judge Robert L. Taylor were supported by substantial evidence and were not clearly erroneous. We would have no right to disturb them. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218. Many of the legal questions raised by UMW were settled by our decisions in Osborne Mining Co. v. United Mine Workers, 279 F.2d 716, certiorari denied 364 U.S. 881, 81 S.Ct. 169 and United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52, certiorari denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L. Ed.2d 1038. The District Judge was familiar with these rules of law since he presided at the trial of the Osborne Min-

ing and Love and Amos cases. These cases involved conduct somewhat similar to that in the cases at bar. We are satisfied that the District Judge correctly applied the rules of law with respect to the issues of liability and damage. In our judgment, the awards of damages to the plaintiffs were not beyond the permissible limits of his discretion and were not excessive.

The judgments in both cases are affirmed.