**WHITE OAK COAL COMPANY, Inc.,**
Plaintiff-Appellee,

v.

**UNITED MINE WORKERS OF AMERICA,** Defendant-Appellant.

No. 14873.

United States Court of Appeals
Sixth Circuit.

May 24, 1963.

As Amended on Denial of Rehearing
July 22, 1963.

E. H. Rayson and R. R. Kramer, Knoxville, Tenn., for appellant, Willard P. Owens, Washington, D. C., on the brief.

Robert S. Young, Jr., and Howard H. Baker, Jr., Knoxville, Tenn., for appellee.

Before WEICK, Circuit Judge, McALLISTER, Senior Circuit Judge, and BOYD, District Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal by the United Mine Workers of America from a judgment rendered against it in favor of White Oak Coal Company, Inc., in the amount of $185,000 for actual damages, and $125,-000 in punitive damages. The verdict of the jury awarded appellee company punitive damages in the amount of $200,000. On remittitur, this award was reduced to $125,000 for punitive damages, and judgment was entered in the aggregate amount of $310,000.

The suit arose out of claimed destruction through dynamiting by the United Mine Workers of the mining machinery and properties of White Oak Coal Company, and unlawful activities of the United Mine Workers in causing large and violent mobs of men to threaten and intimidate employees and persons seeking to do business with the Coal Company, with great resultant loss of business, and loss of valuable leases and improvements; and it was claimed that the wrongful and unlawful activities and conduct of the United Mine Workers, its officers, agents, representatives, and members were prompted by, and carried out with a wanton, deliberate and malicious intent and purpose to destroy the business and property of the White Oak Coal Company.

Appellant contends that there was insufficient evidence to warrant submission to the jury of the question whether appellant had injured appellee's property within the meaning of federal or state statutes; that the District Court erred in submitting to the jury the question whether the Union violated the criminal statutes of Tennessee; that it erred in the admission of evidence; that it further erred in refusing to grant a motion for a new trial based on the passion, bias and prejudice of the jury; that the evidence was not sufficient to warrant the jury's award of compensatory damages; that the District Court erred in failing to explain the circumstances in which a principal is liable for punitive damages under the doctrine of respondeat superior; that the Court was without power, under the doctrine of federal preemption, to approve, to the extent it did, the jury's award of punitive damages; and that the District Court did not properly invoke the doctrine of pendant jurisdiction, in adjudicating the state law claim.

■ Having in mind the rule that, on appeal, the evidence and all inferences to be drawn therefrom must be viewed in the light most favorable to the prevailing party and in support of the verdict, the factual background of the case may, as largely stated by appellee, be set forth as follows:

The White Oak Coal Company, hereinafter called the "Company" or "appellee," was a Tennessee corporation organ-

594

ized in 1957. Its president, U. R. Arnold, owned seven of its ten shares, the other three shares being owned by Mrs. Arnold and their two sons, B. J. Arnold and J. L. Arnold.

In March 1959, the Company operated two surface coal mines, on leases, comprising more than six thousand acres of land in Campbell County, Tennessee. The first area was known as White Oak No. 1, a "drag line" operation in the Jellico seam of coal at Sweet Gum Flats in the above-mentioned county. This mine, with high-grade coal, in a basin adjacent to a county highway, was operated on a three-shift basis, with approximately seven men on each shift, comprising a loading shovel operator, a drag line operator, a bulldozer operator, and oilers and helpers. In the Fall of 1958, the Company had begun contour stripping on the other side of the ridge from White Oak No. 1. This latter operation, known as White Oak No. 2, was working with only one shift, but was in a good seam of coal and was profitable.

In 1958, the equipment, utilized in the stripping operation, had been transferred by appellee Company to another company, of which U. R. Arnold and his wife were owners, and which was known as the Clairfield Equipment Company; and the equipment had then been leased back to appellee Company. The Clairfield Company also leased equipment to another strip mine company, known as the B. J. Arnold Coal Company, which was owned by U. R. Arnold's son. Appellee Company was responsible under these equipment leases for damage to, or loss of, equipment. Another company, the Arnold Coal Company, owned by U. R. Arnold and his wife, was sales agent for all Arnold family mines, and received a commission on the sale of the coal, most of which was sold through the Southern Coal and Coke Company, to whose customers it was shipped by rail.

Appellee Company operated two tipples, or facilities for preparation and railroad loading of coal. One of these tipples, which included a cleaning and treatment plant, was located at a place called An-thras, and the other, some two miles away, at a place called Big Nickel. The coal from White Oak No. 1 was hauled by contract truckers to the Anthras tipple, as was the coal from White Oak No. 2. The truck drivers were employed, controlled by, and paid by the contract truckers, the Snyder Coal Company. A substantial quantity of coal produced by White Oak and affiliated Arnold companies was sold under a term contract by the Southern Coal and Coke Company to the Tennessee Valley Authority. This required that the employees be paid the prevailing Walsh-Healey Wage scale; and they were well satisfied with their wages and working conditions.

In July 1957, near the beginning of White Oak's business operations, there was executed between White Oak and the United Mine Workers, hereinafter called the "UMW," or the "Union," the collective bargaining agreement here involved, known as the National Bituminous Wage Agreement of the United Mine Workers; and appellee Company's employees were, or shortly thereafter became, members of that Union.

In January 1959, the UMW served upon appellee Company, sixty-days' advance notice of the termination of the collective bargaining agreement. At that time, UMW representatives, Prater and Daniel, called upon appellee Company to sign a new collective bargaining agreement. The UMW representatives were thereupon informed by U. R. Arnold, speaking for appellee Company, that he did not believe he could get along with the new agreement, particularly the so-called protective wage features thereof, which required that all coal handled by the Company be mined under the UMW contract; and that while some of the affiliated mine operations were profitable enough to stand the forty-cent per ton payment to the Union's Welfare Fund, others were not.

Under the sixty-day notice, the Union contract with appellee would expire March 15, 1959. Prior to that date, the contract of another operating company, some twelve miles away, had ex-

pired, and Arnold had heard of the intimidation of truck drivers hauling coal to the tipples of the other mine after that contract had expired, and had also heard that a couple of loads of coal from that mining company had been dumped under the direction of UMW representatives, Prater and Daniel. None of the employees of appellee Company had ever complained about the termination of the UMW contract. Prior to the termination of that contract, Arnold directed that all available coal, at both stripping operations, be hauled to the tipples on the day before the termination of the agreement.

On March 16, the day after the termination of the collective bargaining agreement, Hemsworth, the company superintendent, and six of his stripping crew, reported to work at 7 A. M. The men noticed that when they first arrived, there were two or three strange cars parked along the road by the strip pits. Arnold had instructed the men that if there was any trouble or demonstration by the Union, such as a motorcade, they were to do as they were told and avoid getting hurt. Approximately an hour before the men appeared for work, UMW representative Prater appeared at Small's Service Station at White Oak. This was about 6 A. M. Prater then organized a motorcade among several hundred of the men who had congregated there. There were about fifty cars and two hundred men in the motorcade. They arrived at the operation of White Oak No. 1 at the time work was to start, and stopped there. UMW representatives Prater and Daniel then got out of the automobiles, and the employees of appellee Company were thereupon told by Prater and Daniel that they could paint and set the pumps, but could not do any work in the mining of coal. Superintendent Hemsworth indicated that he would follow these instructions and the motorcade then drove off. White Oak employees who were there at the time, and others of other shifts, wanted to continue their work in the mining of coal, but were frightened by the UMW activity.

About a week later, when some of appellee's employees were called to work, another motorcade showed up, and almost every day afterward, a few cars with UMWA posters on their bumpers came by, usually led by Prater.

Prior to March 16, truck drivers employed by Snyder Coal Company, and others, had been threatened and told not to haul any non-union coal. The Snyder truck drivers were those who had been engaged in hauling coal for appellee Company.

During the first week of March, two of Snyder's drivers were accosted on the highway as they came with a load of coal from the Anthras tipple of appellee. They were stopped by a large group of men and asked if the coal they were hauling was Union coal, and when the drivers replied in the affirmative, they were told by the men who stopped them that it was not Union coal, and that if they hauled any more, the men would beat them up. At about the same time, another Snyder driver was hauling coal from appellee's tipple toward Knoxville, and encountered a carload of miners who tried to block the road. Shortly after the above incidents, the drivers of the Snyder Coal Company talked the matter over and decided to quit. Three of these drivers who testified said they were scared to go back. One of the two, who had been stopped, tried to haul coal the next day, and was nearly run off a mountain road by a car containing four or five men.

On the morning of March 16, the day after the expiration of the collective bargaining agreement between appellee Company and UMW, Eddie Ray Franklin, a driver of one of the contract truckers, who was frequently engaged in hauling coal from the White Oak mines to the tipple, was questioned by some of the crowd which later embarked on the motorcade, and cautioned not to haul coal from White Oak. He was allowed to move his truck only after explaining that he was going to the B. G. Arnold mine, whose contract was not due to expire until the following week. Franklin said that

he hauled one load from that mine to the tipple and was met by a number of cars with lights blinking, which he felt was a warning and he then quit. Subsequently, U. R. Arnold went to UMW District Headquarters in Middlesboro, with a representative of the Federal Mediation Service, and with other strip mine operators in the area, in order to carry on negotiations with the Union, but nothing ever resulted from this attempt to negotiate. Arnold, and others, caused unfair labor charges to be filed against the Union with the National Labor Relations Board. On April 30, a preliminary restraining order was issued by the United States District Court at London, Kentucky, enjoining UMW and District 19, United Mine Workers of America, and their representatives and agents, from mass picketing and other unlawful activities. Preliminary arrangements with his employees and trucking contractors were thereupon made by Arnold for the resumption of work. However, these arrangements were postponed, when, on May 6, the Gilchrist Company tipples at Jellico were destroyed by dynamite after two days of hauling coal from the Snyder and Randolph mine in adjacent Whitley County, Kentucky, to the Gilchrist tipples, and one of White Oak's regular contract truckers had been shot at on U. S. Highway 25-W after hauling coal from the Whitley County mine to the Gilchrist tipple. See Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.A. 6). It became impossible to get truckers to haul the coal from the mines to the tipples because of their fear.

In the following month, drivers for Snyder Coal Company were shot at while hauling coal along U. S. Highway 25-W from the remaining Gilchrist tipple even though they had been provided by Ed Daniel, field representative of the UMW, with a "permit" to haul that particular coal over the public highway. During that month, loans by the International Union to District 19 reached the high monthly total of $425,000 of a total for the calendar year 1959 of $2,471,000.

On the night of June 16th, an auger machine of Snyder and Randolph, costing $90,000, and located approximately twelve miles from White Oak, was destroyed by dynamite. See Gilchrist v. United Mine Workers of America, supra.

The beginning of the Summer of 1959 marked the entry of Southern Labor Union, hereafter also called "Southern," into an organizing drive among the coal strip miners made idle throughout the area by the above-mentioned events. Several of White Oak's employees, including Homer Marcum, became interested in Southern and it appeared that it would seek a contract with White Oak. UMW representative Prater and another member of the UMW, a tipple operator, Tom Taylor, berated Southern in UMW White Oak local meetings, and warned that the Southern Labor Union would be kept out of the area by war if necessary. These Union meetings were held in conjunction with the weekly distribution by the UMW of twenty-five dollar grocery orders to the idle coal miners.

As a result of the activity of Southern Labor Union, a group of armed men led by Hubert Bailey came to the White Oak area from across the border in Kentucky, searching for Homer Marcum with the avowed purpose of beating him up because of his activities in behalf of the other Union, which those men called a "yellow dog" union. Prater had declared that the "Jones boys" were going to take care of Homer Marcum. Hubert Bailey was on one of Prater's committees in Whitley County. Prater paid with UMW funds for meals eaten by Bailey and other members of the armed gang at a restaurant designated for such accommodation by Bailey. Prater also paid with UMW funds for gasoline bought by Hubert Bailey in Jellico. Both Prater and Bailey bought some pistols from the proprietor of the restaurant. During the first week of July, Hubert Bailey stated to a group of the men that had accompanied him: "As long as the Union is paying us $25.00 a week and furnishing us plenty of dynamite, Arnold is not about to go back to work."

At approximately 1 A. M. Monday morning, July 13, 1959, the strip mining equipment of Arnold, located at White Oak No. 2, consisting of two power shovels and a bulldozer, was destroyed by dynamite. During the week preceding the dynamiting, Ed Daniel, at a night meeting, told about 150 men that they "had been accused of doing the damage around here," and said: "We might as well go full blast ahead."

On August 16, 1959, an election was held among the employees of White Oak Coal Company, by the National Labor Relations Board, upon a proceeding instituted by Southern Labor Union, in which UMW intervened. Taylor Maddox, a field representative of the UMW, told one of the White Oak Coal employees that if Southern won the election, the employee and his family might get in trouble, and suffer bodily injury. The election was won by UMW, the count being fifteen votes in its favor, and eight votes for Southern Labor Union.

At the instigation of officials of Southern Coal and Coke Company, whose main interest was the resumption of shipments under their TVA contract, a new corporation was formed in September, 1959, under the name of Dixie Pine Coal Company. This company signed the contract with UMW and resumed production, using the former White Oak No. 1 employees and equipment. U. R. Arnold was not financially interested in this company and took no part in its management; but his two sons and his daughter were connected with the new company.

In March 1960, there were posted, in the White Oak area, notices signed in behalf of the UMW, stating that the Union would not interfere with White Oak Coal Company's employees. The notice was, by its terms, required to be posted for sixty days, and was posted pursuant to decree of this Court. Arnold posted some of the notices himself, believing that they would help him in starting back to work without being bothered by disorder. He testified that there was no trouble after this and, in the following month, he organized the Round

Mountain Coal Company and reentered the coal stripping business in Whitley County, Kentucky, near Clairfield, Tennessee, where he lived, not far from White Oak. By the following October an election was held among the employees of the Dixie Pine Coal Company—who were former White Oak employees—and the count was nine votes for Southern Labor Union, four for UMW, and two for no union.

White Oak Coal Company offered evidence of net income of $110,905.25 for the 12-month period prior to the termination of its operation as of March 31, 1959. For the 12-month period after March 31, 1959, the evidence showed a loss of $64,324.40. The difference in the two figures for the two consecutive 12-month periods is $175,229.65. There was also evidence that certain of the markets for coal enjoyed by the company prior to the termination of its operation could probably never be recovered.

The book value of the equipment destroyed by dynamite was $31,164.25 after the deduction of accumulated depreciation taken in income tax returns from an original purchase price of $121,317.80. Witnesses for appellee Company testified that the equipment was in an excellent state of repair immediately before the dynamiting, and was worth approximately $100,000; and that after the dynamiting it was worth only what it would bring as junk and spare parts, or a total of $6,000.

■ Appellant Union contends there was no evidence that it had violated Section 303 of the National Labor Relations Act, 1947, 29 U.S.C.A. § 187, in inducing a secondary boycott of appellee Company. It appears that the activities of UMW were directed against both primary and secondary employers and employees. There was evidence that the union, by off-the-site picketing and other activities, induced and encouraged the employees of a secondary employer to engage in a concerted refusal, in the course of their employment, to transport or handle coal produced by appellee, and that one of the objectives of such action

on the part of the Union was to force the secondary employees to quit the work of carrying appellee's coal, or to force appellee to bargain with the Union as the representative of its employees. "Such evidence disclosed the broad pattern of appellant's campaign, with violence sufficiently spectacular and in such proximity to [appellee's] operation as to become known to secondary employers and their employees and to induce them to discontinue * * * hauling coal" for appellee. Flame Coal Company v. United Mine Workers of America, 303 F.2d 39, 43 (C.A. 6). From the evidence, there can be no question that, not only appellee's employees, but also the secondary employers and employees knew all about the incidents occurring at the other locations and mines. They might reasonably regard these incidents as an indication of what might happen to themselves if they persisted in mining or hauling coal for appellee. The incidents with respect to other mines and locations constituted a form of influence by the Union. Such evidence was admissible. United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716, 725 (C.A. 6). It is to be noted that the secondary employees were first interfered with before mining operations under the bargaining contract came to an end and before the start of any nearby primary picketing activity, of which the first interference could be considered an incidental and permissible part. Cf. Local 761, International Union of Electrical, Radio & Machine Workers, AFL-CIO, v. N.L.R.B., 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed. 592. Under the circumstances here present the jury could properly find the Union engaged in a secondary boycott. See Sunfire Coal Company v. United Mine Workers of America, 313 F.2d 108 (C.A. 6); Flame Coal Company v. United Mine Workers of America, 303 F.2d 39 (C.A. 6); Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.A. 6); United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716 (C.A. 6).

Appellant contends that there was no evidence from which the jury could find that the persons who accosted and interfered with the secondary employees were agents of the Union and that the Union was liable for the results of their conduct. The Union was responsible for the acts of their representatives only if the latter were engaged within the scope of their employment or authority; but actual authorization of specific acts was unnecessary. If the evidence disclosed that the purpose of the Union was, by force and violence, to close appellee's mining operations until appellee should sign a labor contract with it, the Union would be liable for the unlawful conduct of its members, under the leadership of its representatives. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (C.A. 6). By virtue of the fact that appellee Company had not signed an agreement with the Union, the Union was essentially engaged in conflict with the Company. Sunfire Coal Company v. United Mine Workers of America, 313 F.2d 108, 110 (C.A. 6). It was admitted by appellant, on the trial, that the Union was responsible for the acts of the field representatives, Prater, Daniel and Maddox, and for the acts of the officers of the district union. Prater and Daniel were the officials that had called upon Arnold to sign the new labor contract. Prater had organized the motorcade and was among those who told the employees of appellee Company that they could not mine coal. According to one of the witnesses, Prater said there would be "war," if Southern Labor came into Campbell County.

Prater and Daniel admitted that, prior to the dynamiting of the Randolph mining property, they were down at the tipples at Jellico about midnight, and talked with a truck driver who was bringing coal from the Snyder and Randolph mines; that Prater asked the driver not to put the coal in the tipple and told him he didn't care where he dumped it. He told the driver that he·

could dump it anywhere he wanted to and that they had no place picked out for him to dump the coal. The driver then dumped it across the sidewalk and the entrance to the Randolph ramp. Prater said there were two truckloads dumped on the sidewalk while he and Daniel were there. Prater and Daniel were in Jellico the night the tipples were blown up. Daniel was in bed at his home, and Prater was in bed at the Eblen Hotel. They heard the two explosions. Neither one of them got up and went out to see what had happened. Prater "got up at the normal time" next morning and walked down the street to one of the restaurants to have breakfast. Prater and Daniel walked over and saw the dynamited tipples the morning after they were dynamited. Prater made a telephone call to the sheriff. At that time he was not aware who had been arrested. He heard that some UMW miners had been arrested and he was calling "to find out who, and what the charges were, and so forth." Prater had told Randolph that if he didn't sign a contract, he couldn't operate—that they would shut him down. Randolph testified: "I asked him, Mr. Prater, what legal right he had to shut us down, and he said he didn't need a legal right, he took his orders from Washington. And I said 'How will you close me down?' and he said, 'by any means that is required.' "

Prater and Hubert Bailey both bought four pistols from the restaurant proprietor near Jellico. Bailey was authorized by Prater to bring men to the restaurant for regular meals for which Prater would pay each week. Bailey was closely associated with Prater as his agent in arranging what men would be given meals at the expense of the Union; and Bailey, as has been said, declared, on one occasion, that as long as the Union was paying the men twenty-five dollars a week and furnishing plenty of dynamite, Arnold was not going back to work.

A Trooper of the Kentucky State Police testified that he had received several calls and complaints of different people in the community toward the Kentucky side of Jellico, which expressed their fears of being harmed, and also of instances of a group of men traveling up and down the highway. The Trooper, together with other members of the Kentucky State Police, observed this group of men, which included Hubert Bailey, Johnny Cox, Eson Bryant, Clarence Bryant, and Herman Justice. "They went by the name of the 'Over-all Gang' * * * as they were called." All of these men were those who were eating, week after week, at Malcolm Jackson's restaurant at Union expense at the direction of Prater. Jackson had seen Hubert Bailey, Bob Bailey, Johnny Cox and others on several occasions with pistols.

Field representative Daniel gave "permits" to some truckers to haul certain Union coal. After saying, in a speech, according to a witness, that the Union had been accused of doing damage and blowing up things, Daniel declared that they "might as well go full blast ahead." One witness who took a job with White Oak Coal Company as a night-watchman, related a conversation with Daniel after he took the job in July 1959. According to this witness, Daniel told him: "I would rather you didn't work at that. The boys like you and they don't want to hurt you and don't want to get hurt." When the witness told him that he had to work at something, Daniel said: "Well, you can make more money working with a wrecking crew. * * * One night's work will pay you more than you can work for * * * Arnold for a month." The witness then stated to Daniel: "I told him I didn't want that kind of a job."

The general charge of the Court to the jury on the responsibility of the Union for acts of its agents, is set forth hereafter, but, with regard to the authority of an agent to appoint a sub-agent of the Union, the Court instructed:

"Just as the question of whether or not an individual was or was not the agent of the Union is a question of fact for you to decide from direct or circumstantial evidence, so also is

the question of authority of such an agent to appoint a sub-agent of the Union. Such authority may be inferred in the same manner as authority to perform other acts for the principal and may be evidenced likewise by direct or circumstantial evidence. * * * Should you determine from the evidence that any person was authorized by Prater or Daniel to engage in activities for the Union, such person was to the extent so authorized also the agent of the Union for whose acts it would be responsible. * * * Declarations or statements of the supposed agent himself as to the extent of agency and the extent of authority is not proof thereof. Indirect proof of agency, and particularly of the scope of employment, may be established by evidence of other facts and circumstances from which it may be inferred."

From the above, and other facts heretofore recited at length, it appears that there was circumstantial evidence from which the jury could find that the unlawful acts in question were carried out at the instigation of the Union. See Sunfire Coal Company v. United Mine Workers of America, 313 F.2d 108, 109 (C.A. 6). In our view, the evidence was sufficient to enable the jury to find liability on the part of the Union for the destruction of appellee's property, and damage to its business under the delimiting rule laid down in United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. See United Mine Workers of America v. Osborne Mining Co., supra; Sunfire Coal Company v. United Mine Workers of America, supra.

■ Appellant contends that the evidence was not sufficient to warrant the jury in finding that the Union had injured appellee's business in violation of the law of Tennessee. It was alleged in the complaint that the Union, through its duly authorized agents, organized and brought upon appellee's mining properties, a band of men who, by threats of violence and other unlawful means, prevented its employees from continuing their work; that after this initial work stoppage, the Union, through its officials, agents and representatives, continued its roving, mass-picketing in the area of appellee's operations, and encouraged or induced by these and other means, the employees of other employers to engage in a concerted refusal, in the course of their employment, to handle, transport, or deliver coal produced by appellee; that one of the objectives of the Union was to force and compel other employers and persons to cease doing business with appellee, and to compel it to recognize or bargain with the Union as the representative of appellee's employees, although the Union had not been certified as such representative pursuant to the provisions of the National Labor Relations Act; and that, in furtherance of its plans and efforts to keep appellee out of business, the Union, through its agents, employed or directed for that purpose, caused the properties of appellee to be dynamited and destroyed; that it caused large and violent mobs of men to assemble on and near the premises of appellee, and in other areas in the general vicinity, and repeatedly threatened and intimidated individual employees of the appellee, groups of its employees, and other persons and their employees, seeking and desiring to do business with appellee; and that the result of the foregoing was that the appellee's employees and persons seeking and desiring to do business with it, and the employees of such persons, were alarmed, frightened and intimidated to such an extent that the appellee was unable to continue to operate its business, to do business with other persons, or to fulfill its business commitments and obligations.

The District Court charged the jury that, separate and apart from the prohibition of federal law, it was a violation of the law of Tennessee to interfere maliciously or intentionally with the contractual relations of another, except under certain circumstances and for certain purposes; that it was not a viola-

tion of the law of Tennessee for a Union to indirectly cause harm to an employer in interrupting its business and contractual relations by peaceably inducing its employees to go on strike for the purpose of obtaining better wages and working conditions; and that the jury could not find the Union liable, unless it found that it engaged in acts of violence in breach of the peace relative to appellee's mine, and that such conduct damaged appellee's property, or business, or both. The Court properly charged on the scope of authority of agents; on authorization; on the responsibility of the Union for acts of its agents; the nature of proof of such agency, either by direct or circumstantial evidence, and inferences to be drawn therefrom, as well as on the subject of ratification.

The Union submits that the instant case is distinguishable from our opinions in United Mine Workers of America v. Meadow Creek Coal Company, Inc., 263 F.2d 52 (C.A. 6), United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716 (C.A. 6), and Gilchrist v. United Mine Workers of America, 290 F.2d 36 (C.A. 6), since a majority of appellee's employees adhered to UMW despite the effort of a rival union. Nevertheless there is evidence that appellee's employees did not quit work because of the failure of appellee to sign a labor contract with the Union, and, as submitted by appellee, the Union's representatives were engaged in a bitter fight with a rival union that was beginning to make some inroads in Campbell County, Tennessee. A federal injunction, at the time, was in force preventing mass picketing, motorcades, dumping coal from trucks, and other activities. From the evidence, the jury could have properly inferred unlawful conduct on the part of the Union in its conflict with the rival union and with appellee, and could have relied upon the testimony of witnesses quoting Union representatives as announcing such unlawful purposes shortly before the dynamiting.

A review of the record, and especially the facts in evidence heretofore recited, discloses that the proof was sufficient to create an issue for the jury as to whether the activities of the UMW violated the law of Tennessee.

▇ The Union further contends that the District Court erred in instructing the jury with respect to the Tennessee Criminal Statutes. After charging the jury that the Union was privileged to do certain things in causing harm to appellee and interruption of its business as long as the object and means of such activity were proper, it instructed that if either the means or the object were illegal, and appellee were injured as a direct and proximate result of such illegal activity by the Union, the latter would be liable. The Court then went on to enumerate certain conduct made illegal by the Statutes of Tennessee. "The right of civil remedy is not merged in any public offense, but may in all cases be enforced independently of and in addition to the punishment of the latter." Section 39–102, Tennessee Code Annotated. Moreover, if appellee suffered from the Union's violation of statutory provisions, it had a common-law right of action against the Union, as all of the offenses described in the Court's charge are statements of common-law offenses. Violation of the statutes, mentioned by the Court, except the provision which prohibited the transportation or possession of explosives, might not be a common-law offense; but the Court coupled such a violation with the statutes prohibiting two or more persons from entering into an agreement to commit an illegal act capable of producing conditions destructive to life or property by the possession or use of explosives, and that illegal act would be a common-law offense against whoever was injured as a result. The District Court correctly charged the jury as to the law of Tennessee.

▇ Appellant submits that it was reversible error to permit over its objection, Mr. Arnold, President of appellee Company, to relate that certain notices had been posted concerning what UMW would do in connection with employees

in the future. This notice had been posted by the UMW in March 1960, pursuant to certain proceedings, in which an unfair labor practice complaint was issued against the UMW by the National Labor Relations Board. As a result, a settlement agreement, or stipulation, was entered into on which a decree of this Court was rendered providing that the notice would be posted stating that: "We (UMW) will not restrain or coerce employees of G. and R. Coal Company, Inc., Dean Coal Company, Inc., White Oak Coal Company, Inc., Snyder and Randolph Co. Inc., Sunbright Mining Co. Inc. and Whaley Coal Company, or any other employees * * * in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act." The stipulation on which the settlement was entered provided:

"This stipulation shall not be admissible in evidence in any court, administrative proceeding or other tribunal or any other proceeding except for unfair labor practice proceedings brought before or by the National Labor Relations Board."

Appellee, at first sought to introduce the notice which was posted, and the trial judge held that, while it was admissible, he was of the view that, in the light of the stipulation, the notice should not be introduced in evidence. The Court said:

"The court suggested to you * * * that you not put them in on account of the stipulation, but the court must follow the law as he sees it on the questions of evidence. Now they objected to this evidence for the reason that the stipulation stated that it wouldn't be introduced in evidence. Now the court holds that that objection is not good as a matter of law, because this is a public document, and if you insist on filing it as a part of this record, the court holds that you can, but the court suggests to you that you do not do it as a matter of public policy on account of that stipulation."

Counsel for appellee Company, in his examination of Mr. Arnold, asked:

"Q. Had there been—about that time just before that time, were certain notices posted concerning what the United Mine Workers would not do in connection with employees?

"A. Yes, sir. * * *"

It is the above question and answer upon which appellant Union bases its claim of prejudicial, reversal error. A continuation of this testimony is as follows:

"Q. Mr. Arnold, did you personally put up any of these notices?

"A. Yes, sir.

"Q. Where were they posted, if you know?

"A. Just around public places. * * *

"Q. Mr. Arnold, why were you interested in posting these notices?

"A. For the reason that I figured we could start—I could start back to work without being bothered. * *

"Q. Well, did you start back to work without being bothered after that?

"A. Yes, sir, we formed the White Oak—I mean the Round Mountain Coal Company and went back to work.

"Q. Has there been any report to you on any—or do you know of any trouble, that is, dynamiting or intimidations of employees, or trucking employees since that date?

"A. No, sir.

"Q. You haven't heard of any?

"A. No, sir, and we haven't had a bit of trouble."

In its complaint appellee set forth that because of the wrongful conduct of appellant Union, appellee was unable to continue to operate its business, to do business with other persons, or to fulfill its business commitments and obligations.

In its answer appellant set forth:

"Defendant specifically denies that plaintiff was damaged by reason of

an interruption of its business in any amount; or that it lost valuable leases and improvements thereon to its damage."

Counsel for appellee submitted that the notice, having the signature of a UMW officer, gave credence to the testimony of Mr. Arnold as to why he then thought he could go back in business after the notice had been posted in March 1960. The Court then inquired from counsel for appellee why, if he was not claiming damages after March 1960, what effect the notice had with regard to his going into business after the posting of the notices. Counsel for appellant then stated: "I think it lends support to the idea that he was not in bad faith, he was not refusing to work in good conscience. He waited until this defensive action was taken by the Union before he went back to work. And we claim it lends credibility to the proposition that he was not idle intentionally, that he was in good faith and in good conscience in not trying to work before that time." The Court then asked counsel for appellant Union whether he claimed that Mr. Arnold and appellee Company were not acting in good faith in not returning to work before the posting of the notice. In reply, counsel for appellant Union stated: "We take the position that he did not make a reasonable effort to reopen his mine. I do not say he was loafing or any of that, * * * but we do think he did not make a reasonable effort to do what he ought to do to minimize damages or reopen that mine. * * *" The trial judge then said: "I think the proof is competent as bearing on the question of why he did not go back to work during that period." The trial court therefore admitted the evidence not only as bearing upon the state of mind of Mr. Arnold and his employees with respect to labor relations in that coal field area, and to show that it was a basis for Mr. Arnold's contention that he was in fear and his employees were in fear, but also because the proof was competent as bearing on the question why Mr. Arnold did not go back to work until the posting of the notice.

While ruling that the evidence was admissible, the Court gauged its relatively minor importance by observing: "Now this is not going to be determinative in the lawsuit."

We are of the opinion that the proof was properly admitted. The trial court stated that if the notice which had been posted had been offered in evidence (which it was not), it would feel bound to admit it, in spite of the stipulation above mentioned. We concur in this view.

The notices had been posted publicly. They were for the purpose of informing former employees and future employees of appellee and others, that they would not be coerced in the future by the UMW. Mr. Arnold, himself, posted a number of the notices for this purpose. The notices, themselves, were public documents in a much broader sense than a document filed in a public office, for they were to be seen and read by all of the members of the mining community who were interested in working in the various mines. When appellant Union insisted that Mr. Arnold did not make any reasonable effort to reopen his mine after the strike and thereby made no effort to minimize his damages, he was entitled to answer this charge and to show why he did not go back to work in the intervening period, and also why he finally did go back to work. Mr. Arnold's testimony that certain notices had been posted stating what the UMW would do in connection with employees, and that he himself had helped post such notices, was properly admitted. Bausch Machine Tool Company v. Aluminum Company of America, 79 F.2d 217 (C.A.2) cited by appellant is not applicable. There, in a civil antitrust case, plaintiff attempted to question a witness before the jury as to a consent decree rendered in an antitrust proceeding which had been brought on behalf of the government. The Court held that Title 15 U.S.C.A. § 16, made a consent decree, in such a case, inadmissible in evidence.

■ Appellant contends further that the District Court committed reversible

error in permitting the jury to consider evidence of incidents of threats and violence which took place in 1955 and 1956, which was three or four years prior to the incidents giving rise to the present case. In this case, two of the truck drivers hauling coal for appellee Company had been stopped by pickets and told that if they hauled any more coal from appellee's tipple, things would "get rough." One of these truck drivers testified that during the 1955 "No contract—No work" campaign of the Union, he was hauling coal for the same employer when about forty UMW men stopped him on the highway and made him shovel a ten-ton load of coal off his truck. One of the driver's fellow employees testified that the driver had told him of this incident in connection with their being stopped in 1959 and their decision to quit work. These two witnesses also testified that they had heard that John Van Huss, a mining operator, was whipped, kicked, beaten and partially buried, in the 1955 trouble. Van Huss himself actually testified to these facts in the instant case. Although three or four years had elapsed, this unlawful conduct had occurred during the "No contract—No work" campaign, which was the last such preceding campaign before the one in 1959. These, and similar incidents, were relevant as showing the fear of the employees in preventing them from continuing their work and were relevant to show the fear of Arnold himself, which prevented him from continuing with his mining operations. Because these incidents were similar to those occurring in the last preceding "No contract—No work" campaign, they were relevant to the point at issue and were not too remote as evidence which caused such fears and cessation of work. As Judge Leslie R. Darr said in Phillips v. Local 662, Radio and Television Engineers, D. C., 192 F.Supp. 643, 645:

"In determining whether there may be threats or coercion under a given situation, the power and influence lying behind the conduct are important. There may be no bother from the acts or words of a weak person but there might be forced results from acts or words of a strong and influential person."

In United Construction Workers v. Laburnum Construction Corporation, 194 Va. 872, 75 S.E.2d 694, aff. 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025, the Court said:

"The admissibility of the evidence of the reputation of Breathitt county, Kentucky, the site of the plaintiff's work and of the disturbance, for unrestrained lawlessness is governed by the same principle. It was corroborative of evidence on behalf of the plaintiff that there was real cause for its employees being afraid to return to their work."

With regard to the admissibility of evidence showing that a party committed another offense at a different time and place, the United States Court of Appeals of the Third Circuit, in United States v. Stirone, 262 F.2d 571, 576–577, said:

"The question of the admissibility of evidence of offenses other than the one for which the defendant is on trial is a very difficult one. * * *

"So, the general rule, as stated by most courts, is that evidence of other offenses is inadmissible in a criminal prosecution for a particular crime. This rule is qualified by a number of exceptions stated in terms of the capacity of the evidence to prove some specific fact or issue such as intent, plan, scheme or design. E. g., United States v. Klass, 3 Cir., 1948, 166 F.2d 373, 377; United States v. Bradley, 3 Cir., 1945, 152 F.2d 425. But since the range of relevancy, other than for the purpose of showing criminal propensity, is almost infinite, we think the rule may be phrased a little less mechanically. Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part

of the defendant to commit the crime.

"Of course, the trial judge may, in the exercise of his sound discretion, exclude evidence which is logically relevant to an issue other than propensity, if he finds that the probative value of such evidence is substantially outweighed by the risk that its admission will create a substantial danger of undue prejudice. United States v. Feldman, 2 Cir., 1943, 136 F.2d 394, 399; United State v. Shurtleff, 2 Cir. 1930, 43 F.2d 944, 947–948. See Uniform Rules of Evidence 55, 45; Model Code of Evidence Rule 303 (1942). But it must be borne in mind that the greater the probative force of the evidence, the more likely it is to be prejudicial to the party against whom it is offered."

In O'Dell v. United States, 10 Cir., 251 F.2d 704, 707, the Court said:

"Relevant evidence which tends to prove a material fact in the case on trial is admissible even though it incidentally shows that the accused committed another offense at a different time and place. The test in measuring the admissibility of evidence is whether it is material to any issue in the case on trial. If so, it should be admitted even though it tends to establish the commission of another crime. Suhay v. United States, 10 Cir., 95 F.2d 890, certiorari denied 304 U.S. 580, 58 S.Ct. 1060, 82 L.Ed. 1543; Troutman v. United States, 10 Cir., 100 F.2d 628; Crapo v. United States, 10 Cir., 100 F.2d 996; Legatos v. United States, 9 Cir., 222 F.2d 678."

The admission of the evidence in question was not prejudicial, reversible error.

Evidence of many of the incidents of threats and violence above stated was relevant not only upon the issues heretofore mentioned, but also to show a common plan or scheme, as an exception to the general rule excluding proof of similar offenses showing propensity.

After the verdict, appellant moved for a new trial and, as one of its grounds, stated that the amount of the verdict manifested passion, prejudice, and caprice, and that the District Court erred in permitting the jury to award punitive damages. The District Court held that the verdict, as to the punitive damages, was excessive, and ordered a new trial, unless within ten days, the appellee should file in the office of the Clerk, its written consent to the remittitur of the punitive award in the amount of $75,000, which would reduce such punitive award to $125,000. Such remittitur was filed.

There was no mention of any appeal by appellee, to passion and prejudice. The District Court observed that if the award of the jury was grossly excessive or the result of passion or prejudice, it should be set aside; but he provided for the remittitur because, as he stated, he was surprised at its amount in that it was larger than any other punitive award in his memory; and that, if upheld, it might result in an injustice to the appellant. On a review of the record, we are of the opinion that it was not error for the District Court to refuse to strike out entirely the award for punitive damages; that it was proper, under the circumstances, to reduce the award by $75,000; and that the final award for punitive damages could not be held by us to be excessive. See May v. Ellis Trucking Company, 243 F.2d 526 (C.A. 6); Neese v. Southern Railway Company, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60. As to the award of compensatory damages, it was sustained by the evidence which has been heretofore related.

Appellant argues that Section 303 of the National Labor Relations Act of 1947 preempted the entire field of this controversy by providing a remedy for so-called secondary boycott activity, thereby precluding a right to recover punitive damages which were perpetrated in violation of state law. The District Court had jurisdiction to entertain a claim for damages under the federal statutes even though such claim

was joined with a non-federal action for unlawful interference with business. Flame Coal Company v. United Mine Workers of America, 303 F.2d 39 (C.A. 6); United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716 (C.A. 6).

We find no reversible error in the instructions given by the District Court to the jury. Other contentions discussed in the briefs are unnecessary to decision.

In accordance with the foregoing, the judgment of the District Court is affirmed.